ROBBINS GELLER RUDMAN
& DOWD LLP
DENNIS J. HERMAN (220163)
MATTHEW S. MELAMED (260272)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
dennish@rgrdlaw.com
mmelamed@rgrdlaw.com

Lead Counsel for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFREY WEST, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>EHEALTH, INC., et al.,<br><br>Defendants. | Case No. 3:15-cv-00360-JD<br><br><u>CLASS ACTION</u><br><br>CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

## TABLE OF CONTENTS

Page

I. INTRODUCTION ....1

II. JURISDICTION AND VENUE ....5

III. PARTIES ....5

IV. SOURCES OF ALLEGATIONS ....6

V. BACKGROUND AND OVERVIEW OF DEFENDANTS' SCHEME TO DEFRAUD ....7

A. EHTH's Business and Revenue Model ....7

B. Key Company Terms, Calculations, and Metrics ....8

C. The Affordable Care Act and EHTH ....12

VI. FRAUDULENT STATEMENTS, OMISSIONS, AND COURSE OF BUSINESS DURING THE CLASS PERIOD ....18

A. May 1, 2014: 1Q14 Earnings Release, Conference Call, and Form 8-K Current Report ....20

B. June 5, 2014: Jefferies Global Healthcare Conference ....28

C. July 30, 2014: 2Q14 Earnings Release, Conference Call, and Form 8-K Current Report ....30

D. October 30, 2014: 3Q14 Earnings Release, Conference Call, and Form 8-K Current Report ....37

VII. CORRECTIVE DISCLOSURES AND POST CLASS-PERIOD ADMISSIONS ....42

A. January 14, 2015: Defendants Announce Preliminary 4Q and FY14 Financial Results ....42

B. February 25, 2015: Defendants Announce Finalized Financial Results for 4Q and FY14 ....45

VIII. ADDITIONAL ALLEGATIONS OF RELIANCE AND MATERIALITY, LOSS CAUSATION, AND DAMAGES ....49

A. Presumption of Reliance (Fraud on the Market Allegations) ....49

B. Theory of Materiality, Loss Causation, and Damages ....50

1. May 1, 2014 Inflationary Event ....52

2. June 5, 2014 Corrective and Inflationary Event ....54

## TABLE OF CONTENTS

**Page**


3. July 30, 2014 Partial Corrective and Inflationary Event ........ 55
4. October 30, 2014 Inflationary Event ........ 58
5. January 14, 2015 Corrective Event ........ 60
6. February 25, 2015 Corrective Event ........ 61

IX. ADDITIONAL CONTROL PERSON ALLEGATIONS ........ 66

X. CLASS ACTION ALLEGATIONS ........ 67

XI. CLAIMS FOR RELIEF ........ 68

XII. PRAYER FOR RELIEF ........ 72

XIII. JURY DEMAND ........ 72

## I. INTRODUCTION

1. This is a securities class action on behalf of all persons who purchased or otherwise acquired the publicly traded common stock of eHealth, Inc. ("EHTH," "eHealth," or the "Company") during the period from May 1, 2014 to January 14, 2015, inclusive (the "Class Period"), against EHTH, its Chairman and Chief Executive Officer ("CEO") Gary L. Lauer, and its Senior Vice President and Chief Financial Officer ("CFO") Stuart M. Huizinga for violating the Securities Exchange Act of 1934 (the "Exchange Act").[1]

2. This case arises from defendants' fraudulent representations that they had visibility into conversion and churn, the Company-specific metrics most important to investors and analysts during the Class Period and the metrics that provided the basis for EHTH's publicly issued guidance and publicly reported membership.

3. EHTH sells health insurance plans from insurance carriers to consumers online. It is the first and largest private health insurance exchange in the United States and describes itself as the Amazon.com of health insurance. It makes money primarily through commission payments from health insurance carriers on each premium payment received from a customer who enrolled in an insurance plan through EHTH.

4. Entering the Class Period, the individual health insurance market was experiencing a period of rapid growth due to the Patient Protection and Affordable Care Act (the "ACA" or "Obamacare"). Because of Obamacare, millions of individuals without insurance would enter the health insurance market. Analysts and investors believed EHTH was uniquely positioned to take advantage of the massive increase in individuals who would buy health insurance.

5. EHTH reinforced that belief and told investors that it retained visibility into the Company's key metrics despite the market changes driven by the ACA. Those metrics included, most importantly, EHTH's conversion rate – *i.e.*, the percentage of applicants who became paying policy holders – and churn rate – *i.e.*, the percentage of attrition. Defendants credited their visibility into conversion and churn to their constant contact with carriers, their updated calculations to

---

[1] EHTH, Lauer, and Huizinga are collectively referred to herein as "defendants." Lauer and Huizinga are collectively referred to herein as the "Individual Defendants."

account for changes resulting from Obamacare, and their use of a robust customer relationship management system that enabled customer tracking and real-time updates from carriers.

6. During the Class Period, defendants represented repeatedly that they maintained visibility into conversion and churn. Even when financial results were lower than investors had expected based on EHTH's guidance, defendants represented that they retained visibility into those metrics and placed blame for the Company's disappointing results on insurance carriers' inability to handle the increased volume of health insurance applications. After the Class Period, defendants would reveal that they had in fact lacked visibility into conversion and churn since before the Class Period started, and the poor results were primarily the Company's own failure.

7. On May 1, 2014, the first day of the Class Period, EHTH reported its 1Q14 financial results. The end of EHTH's first quarter coincided with the end of the first open enrollment period under Obamacare. The Company reported slightly disappointing revenues but represented the reason was that consumers had submitted a large number of applications in the last few weeks of the quarter. Because EHTH received commissions only after applicants enrolled and paid their premiums, defendants explained that the submissions were too late to generate revenue in 1Q14. But defendants assured investors that the Company would start receiving commissions for the large volume of late-filed applications in 2Q14. Defendants also assured investors that EHTH had achieved a conversion rate higher than 80% in January and that revenues would increase substantially over the next three months as accepted applicants began to pay their premiums. Defendants further assuaged investor concerns by asserting that churn had been within the internal estimates they used to calculate the publicly issued guidance and that new business generated from conversions would far outweigh revenues lost due to churn. On the basis of their purported visibility into conversion and churn, defendants reaffirmed fiscal year 2014 ("FY14") guidance and reported membership numbers. Though EHTH's stock price declined 12% on the disappointing revenues, defendants' false and misleading statements caused it to trade at an artificially inflated price.

8. However, on July 30, 2014, when defendants reported their 2Q14 financial results, revenue and membership numbers disappointed investors again, forcing defendants to reduce FY14 guidance. This time, defendants pointed the finger at the insurance carriers, contending they had

been unable to handle the huge volume of applications they received at the end of the first ACA open enrollment period. As a result of the carriers' inability to timely process applications, EHTH said its conversion rate was 15% lower than previously represented. EHTH's stock price fell more than 34% on the news.

9. Nevertheless, defendants prevented further declines in the price of EHTH shares by again falsely representing that they had visibility into their conversion and churn rates, such that the lowered guidance revealed the full magnitude of the risks then facing the Company. Defendants told investors that churn remained within internal estimates, reassured investors that EHTH maintained visibility into conversion and churn, and assured that the disappointing results reflected delays in receiving revenues, but did not represent a significant decline in EHTH's business.

10. On October 30, 2014, when defendants reported their 3Q14 financial results, they told investors that the lower-than-expected conversion rate, revenues, and the July 30, 2014 guidance reduction had been caused by a small number of insurance carriers who had been unable to handle the onslaught of applications at the end of the ACA open enrollment period. Defendants assured investors that they were working closely with those carriers to resolve the problems by the next ACA open enrollment period, which would run from November 15, 2014 through February 15, 2015. Again, defendants represented that they maintained visibility into conversion and churn.

11. On January 14, 2015, EHTH pre-announced its 4Q and FY14 financial results, which were substantially lower than the Company's publicly issued guidance. Defendants provided little explanation, but analysts noted the obvious: defendants lacked any visibility into conversion and churn. The stock price declined 54% by the close of business the next day, as artificial inflation due to defendants' false and misleading statements and omissions was removed.

12. When EHTH issued its final 4Q and FY14 results on February 24, 2015, defendants admitted that the primary cause of the lower conversion rate was not the insurance carriers' inability to handle the increased volume of applications due to Obamacare, but had been due instead to was the Company's failure to convert applicants to members. Defendants confirmed analysts' conclusions that they lacked visibility into conversion and churn, and admitted they had lacked visibility since before the Class Period started. Defendants acknowledged that, without visibility

into conversion and churn, they lacked a basis for guidance. The Company has not issued guidance since and has said it won't until it has sufficient visibility into conversion and churn to provide a reasonable basis.

13. Defendants' false and misleading statements and material omissions inflated the price of EHTH's common stock and prevented price declines that maintained EHTH's share price at a level higher than it would have traded had accurate and complete information about its financial results, condition, and prospects been timely revealed. Class members suffered significant economic losses when the risks resulting from the false and misleading statements and material omissions manifested, as illustrated by the chart below:



## II. JURISDICTION AND VENUE

14. Jurisdiction is conferred by Exchange Act §27, 15 U.S.C. §78aa. The claims asserted herein arise under Exchange Act §§10(b) and 20(a), 15 U.S.C. §§78j(b) and 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. §240.10b-5.

15. Venue is proper in this District pursuant to Exchange Act §27 and 28 U.S.C. §1391(b). EHTH's corporate headquarters are located in Mountain View, California, where the day-to-day operations of the Company are directed and managed. Many of the false and misleading statements were made in or issued from this District and many of the acts and practices complained of herein occurred or were directed in substantial part in this District.

16. In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, the internet, interstate telephone communications and the facilities of the national securities markets.

## III. PARTIES

17. Lead Plaintiff Oklahoma Police Pension & Retirement System ("Oklahoma Police" or "Lead Plaintiff"), based in Oklahoma City, is a defined benefit plan established to provide pension and other specified benefits to qualified police officers and their beneficiaries in participating Oklahoma municipalities. Oklahoma Police purchased EHTH common stock during the Class Period as set forth in the certification attached hereto as Exhibit A.

18. Defendant eHealth, Inc. is an online health insurance brokerage company incorporated in Delaware and based in Mountain View, California that markets and sells health insurance products online. At all times relevant to the Class Period, shares of EHTH common stock were publicly traded on the NASDAQ Stock Exchange under the ticker symbol "EHTH." The Company regularly communicated with investors through periodic filings with the SEC, press releases, conference calls, and investor and analyst presentations. In addition, the Company has established and regularly publicizes the availability of www.eHealthInsurance.com, on which it maintains an Investor Relations section where SEC filings, press releases, conference call transcripts,

corporate profiles, descriptions of its business, and other information about the Company is made available to investors.

19. Defendant Gary L. Lauer was, and remains, EHTH's Chairman and CEO. As the Company's CEO during the relevant time period, Lauer was regularly quoted in EHTH's press releases, regularly spoke on EHTH's quarterly conference calls to discuss financial results with Wall Street analysts and investors, and regularly made live presentations at analyst-sponsored investor conferences.

20. Defendant Stuart M. Huizinga was, and remains, EHTH's Senior Vice President and CFO. As the Company's CFO during the relevant time period, Huizinga was regularly quoted in EHTH's press releases, regularly spoke on EHTH's quarterly conference calls to discuss financial results with Wall Street analysts and investors, and regularly made live presentations at analyst-sponsored investor conferences.

## IV. SOURCES OF ALLEGATIONS

21. Plaintiffs' allegations are based on the investigation of plaintiffs' counsel, including information contained in EHTH's SEC filings and other regulatory filings and reports; securities analysts' reports and advisories about the Company; press releases, conference call transcripts, and other public statements issued by the Company; and media reports and other sources of information about the Company. The allegations made herein are also based on information obtained from former employees of EHTH with the assistance of outside investigators working at the direction of the lead counsel. Each of the witnesses identified herein has requested that her identity be kept confidential to protect her from possible inconvenience, embarrassment, retaliation, intimidation, or diminished employment prospects should her identity become known to defendants or the general public.[2]

[2] The pronouns "her" and "she" are used generically to apply to former employees discussed herein, regardless of the former employee's gender or gender identity. Witnesses are referred to herein as "CW_."

## V. BACKGROUND AND OVERVIEW OF DEFENDANTS' SCHEME TO DEFRAUD

### A. EHTH's Business and Revenue Model

22. Founded in 1997 and public since 2006, EHTH is the first and largest private health insurance exchange in the U.S. Through its websites and, to a much lesser extent, its customer care center, EHTH enables individuals, families, and small businesses to compare, apply for, purchase, and enroll in health insurance plans from leading health insurance carriers. EHTH operates the websites www.eHealth.com, www.eHealthInsurance.com, www.eHealthMedicare.com, www.Medicare.com, and www.PlanPrescriber.com, through which it conducts the vast majority of its business.

23. EHTH describes itself to investors as the Amazon.com of health insurance. It offers health insurance customers online rate quotes and comprehensive plan information, online plan comparisons and recommendations, and online application and enrollment forms; offers insurance customers and insurance carrier partners direct online processing of customers' applications with carriers; and maintains a robust e-commerce customer relationship management system.

24. At all times relevant to the allegations herein, EHTH was licensed to sell health insurance in 50 states and the District of Columbia, and sold approximately 10,000 health insurance plans issued by approximately 200 health insurance carriers, including but not limited to plans offered by major insurance carriers such as Blue Shield, Aetna, UnitedHealthcare, and Kaiser Permanente. Because each state maintains its own laws and regulations that must be met in order for a carrier to offer a plan for purchase in that state, not all of the 10,000 plans were available to customers in each state. The Company's e-commerce technology enabled electronic delivery of customer applications directly to health insurance carriers.

25. EHTH generates revenue primarily from commissions received from health insurance carriers whose plans are purchased through the Company's website. Those commissions represented 79%, 84%, and 86% of total revenue it earned in FY11, FY12, and FY13, respectively. At all times relevant to the allegations herein, commission payments were typically paid on a monthly recurring basis by carriers for as long as a policy remained active. As a result, much of the Company's

revenue for any given reporting period derived from health insurance policies sold prior to that reporting period.

26. Historically, carriers paid EHTH commission payments as a percentage of the premium paid by the customer for each plan purchased through the Company's website. Starting at the beginning of 2014, some carriers began to pay commissions as a flat amount per member per month. Health insurance pricing, which was set by the carrier and approved by state regulators, was neither negotiable nor discountable by carriers, EHTH, or its competitors.

27. During the relevant time period, EHTH offered four types of insurance plans: (i) individual and family plans ("IFP"); (ii) Medicare-related plans ("Medicare"); (iii) small business plans ("Small Business"); and (iv) ancillary plans ("Ancillary").

28. The IFP policies included major medical individual and family health insurance plans. IFP policies did not include Small Business, Medicare, or Ancillary (*i.e.*, short-term, stand-alone dental, or life, student health insurance plans). The Small Business policies included group health, dental, and vision plans. The IFP and Small Business Plans were purchased primarily through the Company's e-commerce platforms www.eHealth.com and www.eHealthInsurance.com. The Medicare offerings included Medicare Advantage, Medicare Supplement and Medicare Part D prescription drug plans. EHTH started marketing the availability of Medicare products in 2010 through its online Medicare plan platforms, www.eHealthMedicare.com and www.PlanPrescriber.com. Ancillary offerings included standalone dental, vision, life, student, and accident insurance plans.

29. At all times relevant to the allegations herein, significantly more of EHTH's customers signed up for IFP policies than Medicare, Small Business, or Ancillary policies. During the Company's May 1, 2014 earnings conference call, Huizinga represented that commissions from customers enrolled in IFP policies comprised more than 70% of the Company's total revenue.

**B. Key Company Terms, Calculations, and Metrics**

30. **Membership**. EHTH refers to any individual who is covered by an insurance plan for which EHTH is entitled to receive compensation from an insurance carrier as a "member." A customer who purchases and is active on multiple standalone insurance policies will be counted as a

member more than once. For example, a customer who purchases and is active on an IFP policy and an ancillary dental policy will be counted as a member twice.

31. Historically and throughout the Class Period, EHTH reported membership in total and by policy type. The Company said in its SEC filings that membership numbers for each policy type were calculated in the following manner:

(a) For IFP policies, the Company started with the number of IFP members for whom it had received a commission payment for the month six months prior to the estimation date. From that it subtracted a number representing the assumed number of IFP member cancellations over the six-month period, based on historical experience. To that it added the number of approved IFP members over the one- to three-month period prior to the estimation date. (The one- to three-month period varied by insurance product and was largely dependent on the timeliness of commission payment and reporting from the product's carrier.) From that number, it subtracted a number representing the assumed number of IFP members who had not accepted their approved policy and an assumed number of member cancellations through the estimation date based on historical experience.

(b) For Medicare policies, the Company started with the number of members for whom it had received commission payment prior to the estimation date. From that it subtracted an assumed number of member cancellations based on historical experience.

(c) For Small Business policies, the Company estimated the number of initial members at the time the group was approved, and updated the number for changes in membership when the changes were reported to the Company or carrier.

(d) For Ancillary products, the Company started with the number of members for whom it had received a commission payment for the month one to three months prior to the estimation date. (The one- to three-month period varied by insurance product and was largely dependent on the timeliness of commission payment and reporting from the policy's carrier.) From that number, it subtracted a number representing the assumed number of member cancellations over the one- to three-month period based on historical experience. To that number, it added the number of approved members over the one- to three-month period prior to estimation date. From that

number it subtracted a number representing the assumed number of members who had not accepted their approved policy and an assumed number of member cancellations based on historical experience.

32. **Conversion**. "Conversion" refers to the transformation from applicant to member. It is often referenced as a conversion rate (*i.e.*, the percentage of conversion). The precise meaning of conversion depends on its contextual usage. For instance, the approval conversion rate refers to the rate at which applicants to insurance policies are approved for policies. The Company also sometimes addresses the conversion of approved applicants to members. Historically and during the relevant time period, the most widespread usage of the term conversion concerned the transformation from applicant to member. When used in this sense, a conversion rate of 80% means that 80% of applicants became paying members of the insurance policies they applied for.

33. **Churn**. Churn is EHTH's term for member attrition. Like conversion, churn is sometimes referenced as a percentage; a churn rate of 18% means that the Company suffered 18% membership attrition during the time period being discussed.

34. During all times relevant to the allegations herein, rates of conversion and churn were important standalone metrics to the Company and its investors. They were also critical components of the Company's reported membership numbers. Applying the concepts of churn and conversion to the IFP membership formula in ¶31(a) above, the IFP membership calculation used during the relevant time period could be more simply stated as: IFP members six months ago minus IFP membership churn during the preceding six-month period plus IFP conversion during the past one- to three-month period.

35. Conversion and churn were also important drivers into the Company's public financial guidance. When defendants announced, just after the end of the Class Period, that the Company would no longer provide financial guidance, the reason they gave was that they had lost visibility into conversion and churn starting in early 2014. ¶148. Without visibility into conversion and churn, defendants knew that the Company lacked any reasonable basis for financial guidance. *Id.*

36. Unlike many companies, EHTH did not list cost of goods sold as a separate expense line item. It did, however, provide descriptions of several line items that related specifically to customer acquisition. These included:

(a) Cost of Revenue, which comprised payments related to health insurance policies sold to members who were referred to EHTH's website by marketing partners with whom the Company had entered into revenue-sharing arrangements and the amortization of consideration the Company paid to certain broker partners in connection with the transfer of their health insurance members to the Company as the new broker of record on the underlying policies.

(b) Marketing and Advertising, which consisted primarily of member acquisition expenses associated with the Company's direct, marketing partner, and online advertising member acquisition channels. Marketing and Advertising also included compensation and other expenses related to marketing, business development, partner management, public relations and carrier relations personnel who supported the Company's offerings.

(c) Customer Care and Enrollment, which consisted primarily of compensation and benefits costs for personnel engaged in pre-sales assistance to applicants who called the Company's customer care center and for enrollment personnel who assisted applicants during the underwriting process.

These costs are referred to collectively herein as "Member Acquisition-Related Expenses."

37. CW3, who was hired at EHTH in mid-2013 and became a regional account manager at EHTH from January 2014 until she was terminated in March 2015 as part of the Company's global reduction in force in response to the Company's disappointing FY14 results, described a weekly meeting where executives discussed churn and conversion, which she noted were also referred to as attrition and customer acquisition. CW3 said she was one of five regional IFP account managers and that her primary responsibility was to be a liaison between EHTH and a group of approximately 40-50 of its insurance carrier partners. CW3 described weekly meetings called "CREWS" meetings during which participants would discuss weekly reports circulated by Paul Rooney, EHTH's Vice President of Carrier Relations. CW3 said that participants in these meetings included Director of Customer Service Esther Golden, Manager of Retention Rachel Rambo, the

Director of Carrier Retention, regional account managers, and IT personnel. According to CW3, Manager of Retention Rambo was responsible for tracking customer attrition (*i.e.*, churn).

38. According to CW3, the reports included detailed breakdowns of new member acquisitions and customer attrition, and could be filtered and sorted. CW3 said that an assistant to Director of Customer Service Golden would circulate a follow-up e-mail the day after each CREWS meeting. CW3 also said that VP of Carrier Relations Rooney participated in high-level, "closed door" meetings with Company executives in the Company's Mountain View headquarters. According to CW3, these meetings focused on topics including strategic planning and financial review. She said that during these meetings, the executive team reviewed an "Executive Report," which she described as a PowerPoint presentation with detailed sections on each department. CW3 said that Rooney forwarded the Executive Reports to CW3 and other members in the carrier relations department, and that included in the report was information concerning customer acquisition (*i.e.*, conversion) and attrition (*i.e.*, churn), though that information was not as detailed as the information Rooney circulated for the weekly "CREWS" meetings.

**C. The Affordable Care Act and EHTH**

39. The allegations in this lawsuit occurred against the backdrop of Company-specific and industry-wide changes resulting from the implementation of Obamacare.

40. There are several ACA provisions that inform the allegations herein.

(a) ACA imposed a health insurance mandate, which required each individual covered by the ACA to enroll in a health plan that qualifies as minimum essential coverage or pay a penalty. The health insurance mandate first took effect in 2014.

(b) ACA established yearly open enrollment periods. Individuals and families could not purchase IFP insurance outside the open enrollment periods unless they qualified for a special enrollment period as a result of certain specified events, including losing employer-sponsored health insurance, moving to another state, or becoming eligible for a subsidy for health insurance. The open enrollment period for 2014 was from October 1, 2013 through March 31, 2014, just before the start of the Class Period. The open enrollment period for 2015 was November 15, 2014 through February 15, 2015, dates that bookend the end of the Class Period.

(c) The ACA enacted a guaranteed issue provision, which required health insurance carriers to permit applicants to enroll regardless of health status, age, gender, and other defined factors that might predict the use of health services.

41. Investors and analysts believed EHTH was well-positioned to take advantage of the changes. For example, on December 11, 2013, Jefferies issued an analyst report on EHTH titled "Initiating With A Buy: This Broker Story Is Unbroken, 40% EPS Growth to Come." Jefferies reported its expectation that EHTH IFP membership would "surge 19% [year-over-year] in 2014," even when excluding the projected benefit of new federal health exchange business due to technical difficulties afflicting the federal and state exchange websites. The report also addressed expectations related to conversions and churn:

> We believe the ACA's guaranteed issue provision that begins next year will result in improving submitted application to approved member conversion rates. We project that rises from about 60% this year to 80% in 2014, and leads to a 40% increase in approved members (see chart 10 [¶42 below]). Partially offsetting this benefit will likely be increased churn . . . . The net of these moving parts results in an acceleration of IFP membership growth to 19%.

42. The Jefferies report included a chart, reprinted below, that summarized the basis for Jefferies' expectations for EHTH's IFP membership in 2014.

**Chart 10: IFP Membership Is Poised To Grow 19% in 2014 (in '000)**

| | 2010 | 2011 | 2012 | 2013E | 2014E |
|---|---|---|---|---|---|
| ***Submitted Apps To Approved Member Detail*** | | | | | |
| IFP submitted applications | 507 | 439 | 453 | 491 | 521 |
| x Estimated members/application | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 |
| = Estimated members who applied | 761 | 658 | 679 | 737 | 782 |
| x Conversion rate | 55% | 56% | 56% | 60% ➡ | 80% |
| **= Approved members** | **419** | **370** | **382** | **446** | **625** |
| ***YoY growth*** | | | | | |
| IFP submitted applications | | *-13.5%* | *3.2%* | *8.6%* | *6.0%* |
| Approved members | | *-11.6%* | *3.0%* | *16.9%* | *40.2%* |
| ***IFP Membership Evolution*** | | | | | |
| IFP members, beginning of period | | 681 | 675 | 710 | 788 |
| - Churn | | (376) | (347) | (367) | (477) |
| + Approved members | | 370 | 382 | 446 | 625 |
| **IFP members, end of period** | **681** | **675** | **710** | **788** | **937** |
| IFF membership growth | | *-0.9%* | *5.1%* | ***11.1%*** ➡ | ***18.8%*** |
| Annual churn % | | 55% | 51% | 52% | 60% |

Source: CBO, company data, Jefferies

43. Jefferies' analysts were not alone in their positive outlook on EHTH in light of the industry changes resulting from Obamacare or in their focus on conversion and churn rates as key metrics that would illuminate EHTH's success of navigating the changes. On December 20, 2013, SunTrust Robinson Humphrey ("SunTrust") issued a report on EHTH titled "Initiating With Buy." The report "urge[d] growth investors to Buy EHTH shares" based on an "underappreciated" "arc of revenue growth" that would be driven by "increased conversion of sales in the individual and family plan (IFP) market," concluding that "eHealth reminds us of Boardwalk and Park Place." SunTrust also noted that churn was a potential negative catalyst.

44. Analysts also viewed the early technical failures of the public federal and state healthcare exchange websites as a positive for the Company. On February 13, 2014, RBC Capital Markets ("RBC") issued a report on EHTH titled "They built the 'exchange' before there was an 'exchange.'" The report stated that the intense media coverage of technical issues with the HealthCare.gov website had "driven more traffic and application volume in the individual and family plan (IFP) business toward eHealth." While the federal technical issues were keeping EHTH from collecting commission credit from many enrollees eligible for subsidies, RBC stated that the Company was not depending on any meaningful revenue from such applications. Like other analysts, RBC noted that near-term churn resulting from ACA implementation was a significant market dynamic, but viewed Obamacare as an opportunity for EHTH to expand its market share as more potential members use EHTH to shop for and purchase insurance. The report concluded with the analysts' belief that the Company had significant leverage to continue as a leader in the rapidly growing market.

45. According to CW2, contrary to analysts' expectations, EHTH membership had already begun a steep decline in the open enrollment period's first few months. CW2 was a public relations manager employed at EHTH between 2007 and January 2014. Among other responsibilities, CW2 contacted EHTH members for testimonials about their experience of the transition to Obamacare and coordinated media contacts with EHTH members for stories about the same topic. CW2 said that, when asked to find members in the Company's customer relationship management database for such testimonials during the first ACA open enrollment period, she noted

that membership had fallen dramatically. For instance, in cities including Atlanta, Los Angeles, Dallas, Miami, and Chicago, CW2 said that membership had declined from hundreds or thousands in each before open enrollment to low double or even single digits during open enrollment, including one city in which only five members remained.

46. CW2 said that she told her boss Nate Purpura and his boss Brian Mast, EHTH's Vice President of Corporate Communications, within the first few months of the first open enrollment period that membership had fallen drastically. According to CW2, Purpura and Mast both responded that they were already aware of the sharp decline in membership. CW2 also said that Purpura and Mast met at least once a month with Lauer.

47. On February 20, 2014, during the first open enrollment period, defendants issued a News Release, hosted an earnings conference call, and filed an SEC Form 8-K discussing the Company's 4Q13 and FY2013 financial results. Defendants' commentary focused on the Company's 4Q13 IFP performance in light of the start of the first open enrollment period. Lauer represented that the Company had "not seen any unusual changes in our fourth-quarter retention or churn rates compared to historical levels." While Lauer stated that it was too early to estimate 1Q14 churn, he said defendants would be able to do so when commission checks for policies converted in 1Q14 started coming in at the end of February and in March.

48. Jefferies analyst Dave Styblo probed further, asking whether defendants had confidence that EHTH had retained most of its members given the time lag in receiving data about churn from carriers. Huizinga replied that defendants had been working closely with the carriers, "fe[lt] good about what we're hearing" from them, and would have solid data on churn after collecting commission payments in January and February:

> [Styblo]: How do you have any confidence that a large part of your book still hasn't migrated? It seems like you would've received – my understanding is it takes four to five or six weeks to receive that data. Have you received the vast majority of the runs from the insurers telling you who has paid and not? Are you at half, or are you at well below half? Can you give us any sense of just how many – what percentage of that book you've received an update on?
>
> [Huizinga]: We've not received – we still have a lot of data to receive. Let me say that. We need to see who pays in January, and then who also pays in February, in order to really solidify things from a data standpoint. But at the same time, we have been working with the carriers closely to understand, at least from their perspective,

what they're seeing. And at least at that level, we feel good about what we're hearing from our carrier partners.

49. Analysts reacted favorably to the Company's 4Q and FY13 numbers and the commentary defendants provided on the earnings call, and noted with approval defendants' comments about churn. RBC issued a report on February 20, 2014 titled "Investing to extend footprint; guidance/near-term churn questions remain" stating, "[s]ignificant concerns regarding loss of members was [sic] largely put to rest." William Blair issued a report on February 20, 2014 titled "Growth Trajectory Remains Intact; Expanding Opportunity Will Limit Near-Term Margins" stating that "churn was not as material as many expected in the fourth quarter, and lag in membership conversion suggests that first-quarter figures will be even stronger than we had originally anticipated." SunTrust issued a report on February 21, 2014 titled "Reiterate Buy on Positive Enrollment Trends" stating, "The main takeaway from the call was that no unusual changes in churn rate were seen as compared to historical levels at this point in time." Jefferies issued a report on February 21, 2014 titled "Breathing Easier From Better Than Feared '14 Guide" stating, "EHTH isn't seeing IFP churn surging . . . . We still need more data to get comfortable about retention, but the update was a step in the right direction."

50. After reporting 4Q and FY13 results, defendants reassured investors that EHTH maintained systems providing real-time insight into consumer application status and enabling defendants to receive real-time updates from carriers. On March 12, 2014, the Company filed with the SEC a Form 10-K Annual Report for FY13. Pursuant to the Sarbanes-Oxley Act of 2002, Lauer and Huizinga executed certifications that the Form 10-K was both accurate and complete. Among other things, the Form 10-K described the Company's platforms and technology. In that section, the Form 10-K represented that the Company maintained "proprietary back office customer relationship management systems" that "enable us to provide a full range of customer service tasks in an efficient, highly scalable and personalized manner." "Using these tools," defendants represented it was able to "track each consumer through the application process [and] obtain real-time updates from the carrier."

51. According to CW2, the back office customer relationship management system ("Back Office") tracked customer information starting from the moment an application was submitted through EHTH. CW2, the former manager in the Company's public relations group, said she was provided access to Back Office in order to identify EHTH IFP members for testimonials and media contacts. According to CW2, Back Office was updated to reflect changes in membership status, including whether an application was accepted or denied and when a customer enrolled (and thus became an EHTH member). She said that anyone with access to Back Office could determine at any time Company-wide metrics related to applications, acceptances, and membership status.

52. According to CW1, EHTH's conversion rate was negatively affected by a shift in customer behavior that started at the beginning of the first open enrollment period and continued at least as long as she remained at the Company. CW1 was employed by EHTH from 2007 through June 2014 and was a regional account coordinator from 2010 until she left the Company to work for a competitor. According to CW1, she was one of approximately five EHTH regional account coordinators who between them were responsible for managing the day-to-day relationship with all of the insurance carriers offering IFP policies through EHTH. CW1 said that she was personally responsible for relationships with approximately 45-50 of EHTH's carrier partners.

53. CW1 said that, starting at the beginning of the first ACA open enrollment period and continuing at least until she left the Company, the Company was not receiving a large number of commissions from carriers on behalf of accepted IFP policy applicants. According to CW1, this change was widely discussed at EHTH including what she referred to as higher-level meetings in which she was not directly involved but was told about during weekly meetings she participated in with members of the finance department. According to CW1, as part of her job, she contacted carriers to follow up on why commission payments for accepted applicants had not been sent to EHTH.

54. According to CW1, the carriers told her and it was also known within EHTH that many accepted applicants had enrolled but had done so through applications submitted through a different insurance broker for the same policy, and therefore that EHTH would not receive a commission for those accepted applicants. In other words, she explained that applicants were

submitting multiple applications for the same policy through different brokers, one of whom was EHTH. While each such completed application could be accepted, the carrier would assign credit and pay a commission to only one broker for the enrollment. According to CW1, most carriers credited the broker of the first-filed applications while others credited the broker of the last-filed application. CW1 also said that the applicant could send the carrier a letter requesting credit for a specific broker. In her experience at EHTH and since leaving the Company, few applicants did so.

55. CW1 said that, starting shortly after the October 15, 2013 beginning of the first ACA open enrollment period and well before its March 31, 2014 end, the change in applicant behavior – whereby accepted applicants were not converting to EHTH members because they had applied for the same plan through multiple brokers and had enrolled through a competitor – was discussed in a regularly-scheduled weekly customer relations department meeting in which she participated. According to CW1, meeting participants included the four other regional account coordinators, her superiors, including Directors of Carrier Relations Sean Malia and Paul Correia and Vice President of Carrier Relations Paul Rooney, and, for the part of each call during which this issue was discussed, Revenue Accounting Director Stephanie Donohue. During the "higher level" meetings, the participants discussed and adopted solutions during the first ACA open enrollment period to the problem of accepted applicants enrolling through other brokers. According to CW1, the solutions adopted included sending e-mails and making telephone calls to applicants who had been accepted to IFP policies via applications submitted through EHTH.

56. CW1's account is largely corroborated by (and corroborates in large part) the account of another witness. CW3, the regional account manager who described the "CREWS" meetings, recalled that the issue of customers submitting multiple applications for a single IFP policy through different brokers of which EHTH was one, was discussed regularly at CREWS meetings before the March 31, 2014 end of the first open enrollment period.

## VI. FRAUDULENT STATEMENTS, OMISSIONS, AND COURSE OF BUSINESS DURING THE CLASS PERIOD

57. During the Class Period, EHTH, Lauer, and Huizinga, acting with scienter, each made, authorized, or had ultimate authority over statements that were materially false and misleading

to investors or omitted material facts necessary to make them not misleading under the circumstances, as detailed below.

58. The statements alleged herein were misleading both individually and collectively. The false and misleading information in each statement corroborated and bolstered the false and misleading information in each of the other statements, such that the capacity of each individual misstatement to mislead was greater than it would have been in the absence of the other materially false and misleading statements and omissions alleged herein.

59. The alleged misrepresentations herein were made in press releases issued by EHTH, reports filed by EHTH with the SEC, on investor and analyst conference calls hosted by EHTH, and at investor presentations at which EHTH's management appeared and spoke on its behalf.

60. Throughout the course of the Class Period, defendants made false and misleading statements or omitted material facts necessary to make their statements not false or misleading regarding their visibility into churn and conversion. Because they did not disclose that their visibility into churn and conversion was impaired, other statements including financial guidance, membership metrics, and risk warnings, were also false and misleading or materially omitted information necessary to make them not false or misleading.

61. At the outset of the Class Period, defendants touted their visibility into churn and conversion, representing that the rate at which applications converted to paying members was above 80%. Defendants also reassured investors that churn was within the Company's internal expectations. But merely one quarter later, defendants would state that the conversion rate was 15% or more lower than they had previously represented. Defendants would also admit later that they had lacked visibility into churn and conversion by the outset of the Class Period.

62. During the middle and latter portion of the Class Period, as revenues fell further short of expectations due in part to the fact that the conversion rate had fallen at least 15% below the more-than 80% defendants had previously represented, defendants represented that blame for the lower-than-expected conversions rested primarily on carriers' shoulders. According to defendants, the carriers could not handle the volume of applications submitted during the ACA open enrollment period, which caused the Company's low conversion rate. All the while, the Company continued to

represent that churn remained consistent with expectations. However, defendants would later admit that the primary source of the low conversion rate was not carrier failure but rather the Company-specific failure to convert applicants into paying members, and that they had lacked visibility into churn and conversion all along.

63. The risks arising from defendants' false and misleading statements and omissions of material fact manifested on January 14, 2015, when the Company pre-announced 4Q14 and FY14 financial results that failed to meet its guidance. In response, analysts realized that, despite defendants' prior representations to the contrary, the Company lacked any visibility into churn and conversion. Defendants confirmed as much on February 25, 2015, when the Company issued its final 4Q and FY14 numbers.

64. Defendants' stock price started the Class Period at $36.74, reached a Class Period high of $39.00 on June 9, 2014, and fell to $9.42 on January 15, 2014, having declined 76% from the Class Period high and 54% from the day before, as all of the artificial inflation due to defendants' misrepresentations was finally removed from the stock.

### A. May 1, 2014: 1Q14 Earnings Release, Conference Call, and Form 8-K Current Report

65. When defendants announced their 1Q14 financial results, they fraudulently touted their visibility into key metrics, important to answering investors' concerns about how the Company would navigate the first ACA open enrollment period. Though defendants' announcement of disappointing revenues caused EHTH's stock to drop 12%, their false and misleading assurances kept the stock price from falling further. Defendants falsely and misleadingly represented that they retained visibility into conversion and reassured investors that the disappointing revenues resulted from a large number of late-filed applications and would therefore be temporary. By way of proof, they represented that the Company's conversion rate for IFP applications had exceeded and would continue to exceed 80%, leading to a significant increase in recurring revenues when the Company started receiving commissions from those late-filed applications in 2Q14. Defendants also addressed another area of concern in the new, post-ACA environment by representing that churn rates were well within the expectations baked into the Company's full-year guidance.

66. In truth, defendants' visibility into conversion and churn had been substantially compromised. They would later admit that churn and conversions changed significantly before May 1, 2014. Thus, while defendants professed confidence in their ability to analyze those key trends, the representations lacked any basis. It follows that because membership and financial guidance were, by the Company's own description, based substantially on calculations involving churn and conversion, defendants knew that their guidance and membership metrics also lacked a reasonable basis.

67. On May 1, 2014, after the market closed, EHTH issued a News Release and filed a Report on Form 8-K with the SEC announcing the Company's financial results for 1Q14. The press release, titled "eHealth, Inc. Announces First Quarter 2014 Results," was initially distributed to the market via Marketwired. Thereafter, the release was disseminated further by other news organizations, financial analysts, investor websites, and other sources of information for investors. As a result, the information communicated in the press release became widely available to investors and reflected in the market price for EHTH securities. The release was issued by EHTH and authorized or approved by each of the Individual Defendants. Defendant Lauer was quoted in the press release. In the News Release, EHTH reported 1Q14 revenues of $50.9 million, a year-over-year increase of 18%; and non-GAAP net income of $0.1 million, or $0.01 per diluted share, compared to 1Q13 non-GAAP net income of $3.6 million, or $0.17 per diluted share.

68. On May 1, 2014, after issuing the News Release, EHTH hosted a conference call to discuss the Company's 1Q14 financial results with institutional investors and analysts. Defendants Lauer and Huizinga participated in the call, along with EHTH executive Kate Sidorovich, Vice President of Investor Relations. Analysts representing eight major Wall Street brokerage houses also participated in and asked questions during the conference call. The call was publicized in advance by the Company, and a webcast of the call is maintained on the Investor Relations portion of EHTH's website. Written transcripts of the call were also published and disseminated by Thomson Reuters and other sources. The contents of the call were reported by news organizations and discussed in analyst reports and on the Internet. As a result, the information communicated on the call became widely available to investors and reflected in the market price for EHTH securities.

69. **Conversion.** During the earnings call, in response to a question from Jefferies analyst Dave Styblo, Huizinga represented that the Company had experienced IFP conversion rates of more than 80% for 1Q14 based on conversions received to date.

> [Styblo:] . . . So to think about those, that surge, those folks [IFP applicants] would be generally under the guaranteed issue. We'd expect a higher conversion rate of something upwards of 80% on that base?
>
> [Huizinga:] That's right. Yes, that's what we saw in January, the first kind of full month of conversion that we have in house.

70. In an exchange with Cowen analyst Kevin Kopelman, Lauer and Huizinga reaffirmed that the Company was experiencing a close ratio (*i.e.*, conversion rate) of applications of more than 80% in 1Q14 and that, due to the conversion rate, each submitted application had become more valuable to the Company.

> [Huizinga:] . . . I also want to just for others' sake, just mention that this close ratio is definitely making each submitted application more valuable to us than it's been in the past. As we move from what I described from mid-50s to 60% close ratios up to 80%, although we've seen roughly a 30% to 35% increase in the value of a submit just based on that close ratio change, and then we're tacking a little bit of a premium increase as well, so.
>
> [Lauer:] Yes, we had commented in the last earnings call, I think Stuart had said that we had seen a close ratio or expected something around 70%. We're actually, as you said in January, seeing close to 80%. And so when you think about effectively what we're spending on a per unit basis for cost of acquisition we're getting a much more attractive conversion rate there and an improved cost of acquisition, which frankly we had anticipated because of the guaranteed issue provision that's in the Affordable Care Act.
>
> [Kopelman:] Yes, and when you say January, that's mostly reflective of the people who are submitting at the end of December and then?
>
> [Huizinga:] No. Actually when I say that I'm lagging things back to January submits. So I'm talking about January submits and what percentage of the January submits we've seen close. . . .
>
> [Lauer:] We like 80%. That's a very healthy close ratio.

71. Lauer's and Huizinga's representations about the close (*i.e.*, conversion) ratio were false and misleading and omitted information necessary to make them not misleading at the time they were made. On July 30, 2014, the Company would announce that conversion rates for 1Q14 were more than 15% lower than represented on the May 1, 2014 call. ¶97. On the same date, Huizinga would also state that defendants still lacked information regarding a large number of

applications submitted in 1Q14 and would blame carriers for failing to timely process applications and accurately allocate commissions to brokers. ¶97; *see also* ¶¶119-120. Defendants would later admit that the first ACA open enrollment period caused conversion to change so significantly that the Company lacked sufficient visibility into conversion to offer a reasonable basis for guidance and that conversion was lower than represented because the Company was not converting applicants to paying members. ¶¶146-149.

72. Defendants also failed to disclose countervailing trends they knew would counteract their statements about conversion. Specifically, defendants conflated the acceptance rate and the close rate but knew or recklessly disregarded that applicants were submitting more than one application for the same IFP policy. ¶¶38, 41, 52-56, 69-70; *see also* ¶88. While the application acceptance rate may have been higher than 80% due to the ACA guaranteed issue provision, applicants were not expected to enroll in more than one IFP policy. ¶¶52-56. According to CW1 and CW3, the regional account manager and coordinator, a substantial number of EHTH's IFP customers had been submitting applications for the same policy through multiple insurance brokers since the start of the first ACA open enrollment period. *Id*. Thus, even when an applicant who had applied for an IFP policy through EHTH was accepted to that policy, carriers often credited another broker for that customer's commissions. ¶54. CW1 and CW3 reported that conversion was discussed at weekly meetings and CW3 reported that it was discussed in Executive Reports that were discussed at high-level meetings at corporate headquarters. ¶¶37-38, 53, 55-56. These meetings were documented and reports with the latest conversion information were circulated by email to EHTH executives. ¶¶37-38.

73. Lauer's representation that applications were more valuable than they had been in the past was false and misleading and omitted information necessary to make it not false or misleading at the time it was made. As reflected in the chart below, the commission per member in 1Q14 fell 2.5% sequentially and 4% year-over-year. The chart also shows Lauer's representation that the Company's cost of acquisition had improved to have been false and misleading, or to have omitted information necessary to make it not misleading, as Acquisition-Related Expenses in 1Q14 had increased 19% sequentially and 42% year-over-year. Even using the Company's membership

calculations, which themselves lacked a basis and were inflated due to the Company's lack of visibility into conversion and churn (¶¶78-79), the Company added 41,300 net new members sequentially in 1Q14, meaning that the Company spent $846 in Acquisition-Related Expenses per net new member – 183% more than the $299 per net new member it spent in 4Q13 and 143% more than the $348 per net new member it spent in 1Q13.

| | 1Q13 | 4Q13 | 1Q14 |
|---|---|---|---|
| ACQUSITION-RELATED COSTS | | | |
| Cost of Revenue ($) | 2,651,000 | 1,020,000 | 2,113,000 |
| Marketing & Advertising ($) | 14,835,000 | 28,212,000 | 23,109,000 |
| Customer Care & Enrollment ($) | 7,166,000 | 11,186 | 9,713,000 |
| Total Acquisition-Related Costs ($) | 24,652,000 | 29,243,186 | 34,935,000 |
| *Acquisition-Related Costs (% seq)* | | | *19%* |
| *Acquisition-Related Costs (% seq)* | | | *42%* |
| MEMBERSHIP | | | |
| Reported Total Membership | 1,053,800 | 1,244,900 | 1,286,200 |
| Net Added Membership (seq) | 70,900 | 97,800 | 41,300 |
| Acquisition-Related Costs per Total Membership ($) | 23 | 23 | 27 |
| *Acquisition-Related Costs per Member (% seq)* | | | *16%* |
| *Acquisition-Related Costs per Member (% yoy)* | | | *16%* |
| Acquisition-Related Costs per Net Added Member ($) | 348 | 299 | 846 |
| *Acquisition-Related Costs per Net Added Member (% seq)* | | | *183%* |
| *Acquisition-Related Costs per Net Added Member (% yoy)* | | | *143%* |

74. **Churn.** During prepared remarks on the conference call, Lauer represented that 1Q14 membership churn was within internal estimates and that, as a result, new memberships would continue to outpace churn in FY14.

> I would like to make some comments regarding retention within our existing book of business. Based on the most recent data, including commission payments that we've received from our carrier partners so far, our current estimate of churn for the first quarter of 2014 falls well within the range that we assumed in our 2014 annual guidance, which we provided on our last earnings call. So we continue to forecast growth in our individual membership base in 2014 with new member inflow more than offsetting the estimated impact of churn.

75. Huizinga informed investors that the Company had updated its internal methodology for calculating churn in order to account for the industry changes resulting from the ACA.

> Typically, our view of churn is based on a six months look back period, however, given the significant changes that have occurred in our industry as a result of the Affordable Care Act we have taken additional steps to make our first quarter churn estimates more current. Specifically we incorporated more recent data than we normally would, particularly around the transition from December 31, 2013 to

January 1, 2014, the first date on which new plans became effective for members making a transition off pre-Affordable Care Act plan.

76. Analysts credited defendants' representations that EHTH maintained visibility into churn in the post-ACA environment and reacted positively to the representation that churn was lower than they had expected. For example, a May 2, 2014 Jefferies report titled "With 1Q Done, the Market Can Finally Focus on LT Growth" stated "Heading into 1Q, we were concerned that a surge in churn . . . would offset strong application growth. . . . The better outcome was a result of higher application growth and lower churn . . . ." And, a May 2, 2014 Deutsche Bank analyst report titled "1Q Largely In Line; 2014 Guidance Reaffirmed" stated "[c]hurn was better than we expected." *See also* §VIII.B.1.

77. Lauer's and Huizinga's representations about churn were false and misleading or omitted information necessary to make them not false or misleading at the time they were made. Defendants would later admit that, due to the significant changes caused by the ACA open enrollment period, the churn rate had changed significantly. ¶¶146-148. Thus, it was knowingly or recklessly false and misleading for defendants to represent that they maintained visibility sufficient to provide a basis for representing that churn was within internal estimates and would be more than offset by conversions. In fact, according to CW2, the public relations manager, membership had already sharply declined during the first few months of the first ACA open enrollment period and executives who met regularly with Lauer were aware of the membership decline. ¶¶45-46. According to CW3, churn – which she called attrition – was discussed in weekly "CREWS" meetings within the carrier relations group and was detailed in regularly circulated Executive Reports circulated with EHTH executives. ¶¶37-38.

78. **Membership**. It follows that because defendants did not disclose that visibility into conversion and churn had been impaired, their reported IFP and total membership was false and misleading because it lacked a reasonable basis. In the News Release and on the earnings call, defendants represented that total estimated membership for IFP policies as of March 31, 2014 increased 8% year over year to 800,200, from 738,900 as of March 31, 2013, and that total estimated membership as of March 31, 2014 increased 22% year over year to 1,286,200 members, from

1,053,800 as of March 31, 2013. Analysts and investors reacted favorably to the growth in EHTH membership, especially of IFP members. For example, the May 2 Jefferies report titled, "With 1Q Done, the Market can Finally Focus on LT Growth," saying "IFP Membership A Little Better Than Our Forecast." *See also* §VIII.B.1.

79. Defendants' estimates of IFP and total membership were false and misleading or omitted information necessary to make them not false or misleading at the time they were made. Membership was calculated by adding conversions and subtracting churn from prior membership. ¶¶31, 34. The loss of visibility into churn and conversion thus led to a loss in defendants' ability to calculate membership. In addition, defendants had access to Back Office, which would have provided the up-to-date membership numbers that reflected the lower conversion rate due to applicants' submissions of multiple applications through different brokers. ¶51.

80. **Guidance.** Because defendants did not disclose that their visibility into churn and conversion was compromised, their guidance lacked a basis in historical fact and was therefore false. The News Release also reaffirmed the guidance first issued by the Company in its February 20, 2014 News Release of full-year revenue of between $206 and $213 million, EBITDA of between $18.0 to $22.5 million, and non-GAAP net income per diluted share of between $0.43 and $0.51. Defendants also discussed their guidance during the earnings call. Analysts and investors noted with approval the reaffirmation of guidance. For example, the May 2 Deutsche Bank report titled, "With 1Q Largely In Line; 2014 Guidance Reaffirmed." *See also* §VIII.B.1.

81. Because defendants lacked visibility into churn and conversion, it follows that they lacked a reasonable basis for their guidance. Churn and conversion calculations were "two important drivers" of the Company's guidance and defendants would later admit that they had lost visibility into churn and conversion in early 2014. ¶¶146-148. Without visibility into churn and conversion, defendants lacked a reasonable basis for issuing financial guidance. ¶¶35, 148.

82. **Risk Warnings.** The risk warnings that accompanied the Company's May 1, 2014 News Release and conference call were themselves false and misleading and omitted material information necessary to make them not misleading. The risk warnings that accompanied the News Release warned generally of risks associated with, in relevant part, "eHealth's ability to accurately

estimate membership," "changes in member conversion rates," and "retention rates," which echoed verbatim warnings provided in the Company's February 20, 2014 News Release. The May 1, 2014 earnings call was prefaced by language warning generally of risks and uncertainties associated with, in relevant part, "expectations regarding the approval rates and applications submitted during the quarter," "our estimate of the number of revenue generating IFP members," "our churn rate and current churn estimates for the first quarter of 2014," and "our estimates of various components of our membership and our 2014 guidance with respect to revenue." *See id.*

83. The May 1, 2014 earnings call also referred generally to the descriptions of risks and uncertainties described in the Company's recent Forms 10-K and 10-Q, but did not tell investors to which Forms 10-K or 10-Q they should refer: "We describe these and other risks and uncertainties in our annual report on form 10-K and quarterly reports on form 10-Q filed with the Securities and Exchange Commission, which you may access through the SEC website or from the investor relations section of our website." The Company's then most recent such filing, its SEC Form 10-K for FY 2013, filed on March 12, 2014, contained sections warning of risks related to churn and conversion with the following headers:

> "If we are unable to retain our members, our business and operating results would be harmed."
>
> "We rely on health insurance carriers to accurately and regularly prepare commission reports, and if these reports are inaccurate or not sent to us in a timely manner, our business and operating results could be harmed. We also may not recognize trends in our membership as a result of a lack of information from health insurance carriers."

Under the second header, the warning read, in relevant part:

> As a result of open enrollment periods, we may not receive information from our carriers on as timely a basis as in the past due to significant spikes in volume, which could impair the accuracy of our estimates of the number of members we have for a period of time. Additionally, health insurance carriers may require us to return commission payments paid in a prior period due to policy cancellations for members we previously estimated as being active. For these and other reasons, including if current trends in membership cancellation are inconsistent with past cancellation trends that we use to estimate our membership or if carriers subsequently report changes to the commission payments that they previously reported to us, our actual membership could be different from our estimates, perhaps materially.

84. Those warnings purported to alter investors to risks and contingencies that had, in fact, already occurred. As pled above and incorporated herein:

- Defendants already lacked visibility into churn and conversion, and therefore lost the basis for estimates into numerous metrics including those related to membership, conversion rates, retention rates, and the number of revenue generating IFP members. ¶¶71-72, 77, 79.

- Membership rates had already dropped precipitously at the start of the open enrollment period due to customer submissions of more than one application for a single IFP policy. ¶¶45-46, 77.

- Conversion had been based on the false assumption that each accepted applicant would convert to a member, and this was a topic of weekly discussions including EHTH executives going back to the beginning of the open enrollment period. ¶¶38, 41, 52-56, 69-70, 72.

- Defendants were not using the most accurate internal source of information, the Back Office database, to calculate conversion accurately based on the number of payments received for the period. ¶51.

85. In addition, the warnings omitted material information necessary to make them not misleading. For example, none of the warnings addressed risks to the Company's visibility into churn or conversion. They also did not warn of other risks, including those associated with the Company's "ability to timely receive and accurately predict the amount of commission payments from health insurance carriers," "changes in conversion rates," "variability in the timing of commission payments from health insurance carriers," "expected conversion rates from submitted to approved members" – all warnings added to subsequent Class Period News Releases and earnings calls. ¶¶112, 129-130.

**B. June 5, 2014: Jefferies Global Healthcare Conference**

86. Just over one month later, Lauer again misrepresented that EHTH's conversion rate continued to increase. In so doing, he not only professed implicitly the Company's visibility into this crucial metric, but he also misrepresented that accepted applicants would convert to paying members on a one-to-one basis. As alleged above, the Company's visibility into conversion at the time of Lauer's representations was impaired and it would later disclose that it was struggling to turn accepted applicants into members. Less than two months later, the Company would tell investors that its conversion rate was at least 15% lower than previously represented.

87. On June 5, 2014 at 8 a.m. ET, defendant Lauer presented on behalf of EHTH at the Jefferies Global Healthcare Conference. The conference was publicized in advance by the Company and a copy of the slides presented by Lauer is maintained on Jefferies' website. Written transcripts of the presentation were published and disseminated by Thomson Reuters and other sources. The contents of the presentation were reported by news organizations and discussed in analyst reports and on the Internet. After the presentation, analysts at Jefferies issued a report about its contents. As a result, the information communicated at the presentation became widely available to investors and reflected in the market price for EHTH securities.

88. During the presentation, Lauer represented that the Company's conversion rate, which defendants had previously represented was greater than 80%, continued to increase due to the ACA's guaranteed issue provision:

> And by the way, our conversions continue to increase, because now, as a result of the Affordable Care Act, there's something called guaranteed issue, which means that no one who applies for health insurance can be denied. Previously in most states insurers were able to deny individuals. 15% to 20% of those who wanted to buy could buy, had the money to buy, were denied the ability to buy by insurance companies because of medical conditions, histories, and so on.

89. This statement was false and misleading and omitted information required to make it not false or misleading at the time it was made. On July 30, 2015, defendants told investors that the Company's conversion rate was more than 15% lower than it had previously represented, that the Company had not received payment on a large number of accepted applications submitted in 1Q and 2Q14, and that the Company lacked the information necessary to determine why conversions had come in at such a low rate. ¶¶96-97. Defendants would later admit that conversion shifted substantially starting in early 2014, months before Lauer's June 5, 2014 representation that conversions continued to increase. ¶¶146-149. Lauer and Huizinga would also state that information regarding churn and conversion took months longer to access under the ACA than it did before. ¶152. Thus, Lauer lacked any basis for his representation that conversions continued to increase.

90. In fact, conversion rates had fallen noticeably since the start of the first ACA open enrollment period according to CW1, the regional account coordinator. ¶¶52-55. She said that,

concomitant with the ACA open enrollment period, a number of EHTH's customers began to submit applications for a single IFP policy not only through EHTH but also through other brokers. *Id.*; *see also* ¶56 (CW3 also said that applicants were submitting multiple applications through different brokers for the same policy). Carriers would select one broker to credit for the application and commission, which caused EHTH's conversions to decline. ¶54. The conversion effect of this on EHTH's rate was so significant that CW1 said the VP of Carrier Relations and his staff had sought solutions to this problem before the open enrollment period ended and that it was addressed during weekly meetings with members of other EHTH divisions and, according to CW3, in Executive Reports discussed at high-level closed door meetings at corporate headquarters. ¶¶55-56.

### C. July 30, 2014: 2Q14 Earnings Release, Conference Call, and Form 8-K Current Report

91. On July 30, 2014, after the market closed, EHTH issued a press release and filed a Current Report on Form 8-K with the SEC announcing the Company's financial results for 2Q14. The press release, titled "eHealth, Inc. Announces Second Quarter 2014 Results," was initially distributed to the market via Marketwired. Thereafter, the release was disseminated further by other news organizations, financial analysts, investor websites, and other sources of information for investors. As a result, the information communicated in the press release became widely available to investors and reflected in the market price for EHTH securities. The release was issued by EHTH and authorized or approved by each of the Individual Defendants. Defendant Lauer was quoted in the press release.

92. In the News Release, EHTH reported 2Q14 revenues of $42.6 million, a year-over-year increase of 7%; and non-GAAP net income of $4.3 million, or $0.22 per diluted share, compared to 1Q13 non-GAAP net income of $2.4 million, or $0.12 per diluted share.

93. On July 30, 2014, after the market closed, EHTH hosted a conference call to discuss the Company's 2Q14 financial results with institutional investors and analysts. Defendants Lauer and Huizinga participated in the call, along with VP of Investor Relations Sidorovich. Analysts representing seven major Wall Street brokerage houses also participated in and asked questions during the conference call. The call was publicized in advance by the Company and a webcast of the

call is maintained on the Investor Relations portion of EHTH's website. Written transcripts of the call were also published and disseminated by Thomson Reuters and other sources. The contents of the call were reported by news organizations and discussed in analyst reports and on the Internet. As a result, the information communicated on the call became widely available to investors and reflected in the market price for EHTH securities.

94. The 2Q14 News Release and earnings call acted as a partial disclosure, dissipating some of the artificial inflation in EHTH's stock price. Financial results were lower than expected and the Company reduced FY14 financial guidance, blaming the poor results and reduced guidance on an IFP conversion rate that was 15% or more lower than previously represented, including a large number of applications that had not converted from 1Q14. ¶¶96-97.

95. But the partial disclosure itself was false and misleading and omitted information necessary to make it not false or misleading. Defendants not only continued to represent that they maintained sufficient visibility into conversion to identify the lower conversion rate percentage, but also represented that the primary reason for the lower-than-expected conversion rate was insurance carriers' failure to timely process applications or properly allocate commission payments to the Company and other insurance brokers. Defendants would later admit that both of those representations were false and misleading: visibility into conversion had been impaired and the low conversion rate was primarily the Company's fault. Moreover, defendants continued to misrepresent that churn was within internal estimates, but later admissions would establish that they lacked any basis for that representation. Due to defendants' lack of visibility into conversion and churn, the Company's reduced financial guidance and reported membership continued to lack any reasonable basis.

96. **Conversion.** On the earnings call, Lauer stated that, among the factors that had negatively influenced 2Q14 financial results, the Company had still not received first commission payments from a large number of approved applicants whose applications were submitted during the first and second quarters: "[W]e have not received a first commission payment on a large number of applications that were submitted in the first and second quarters, and that were approved by carriers, which adversely impacted our second quarter membership and revenue."

97. When William Blair analyst Adam Klauber asked about the reason for non-payment by approved members, Huizinga replied that the Company had not yet determined why the conversion rate was lower than historical rates but the carrier had misattributed commission payments to brokers and had experienced systems issues. He also surprised investors by stating that the conversion rate was 15% or more lower than defendants had previously represented.

> [Klauber:] And of that, the non-payment, is that from carriers just not having the data at this point still, is that what's going on?
>
> [Huizinga:] In some cases, that's clearly what's going on. We've had carriers specifically tell us that they've had system issues, they'd acknowledged that. We're still waiting for them to resolve those. We've had situations where we have seen these non-payment shortfalls. We've brought them to the attention of the carrier, they worked through them and they've determined that they had broker attribution issues specifically. But we have to push to get that. I will say that it's very wide – these are very wide range of outcomes among carriers. Some carriers are very much in line with their historical norms, and there are other carriers that very [sic] significantly offer [sic] their norms. So it's very carrier by carrier specific.
>
> [Klauber:] So historically, but before the change in the ACA, what was the general percentage of non-payment and what is it running right now for approved members?
>
> [Huizinga:] So historically, if you go back to this time a year ago, you'd see high 80s-percent conversion. And for Q1, we saw low 70s. So we are seeing 15% or more of delta.
>
> [Klauber:] And at this point it sounds like you just don't know whether that people are not paying or systems issue, it sounds like a combination, but you really don't know. I mean you don't know, but I mean it's just the data isn't out there to know, is it just people not paying or is it just a systems issue? Is that right?
>
> [Huizinga:] That's correct. We still need – at this stage, we still need more information from carriers to fully understand what still needs to be resolved in their systems and what simply is non-payment.

98. Thus, Huizinga simultaneously averred that the Company needed more information while also telling investors that defendants maintained sufficient visibility to provide a conversion rate for 1Q14 in spite of Lauer's representation that EHTH was still waiting for payment on a large number of 1Q14 applications. ¶96. Huizinga also made specific statements placing blame for at least part of the conversion issue on the insurance carriers without admitting that the primary source of the low conversion rate was the Company's failure to drive applications through to membership. ¶149. Thus, Huizinga continued to give investors the impression that defendants had visibility into conversion and that the primary cause of the shortfall was external.

99. While disappointed in the Company's reduced guidance, analysts credited defendants' explanation that it was caused primarily by the lower conversion rate. For example, on July 31, 2014, Jefferies issued an analyst report titled "Disastrous 2Q Update Will Pressure Stock," stating "[w]eak results in the IFP segment caused the revenue shortfall . . . . [IFP] apps aren't converting into paid members . . . ." That same day, SunTrust issued an analyst report titled "Guidance Lowered on Payments; Thesis Remains Intact" stating that "revenue and membership were impacted by lower payments." *See* §VIII.B.3.

100. Analysts also reported that the reason for the lower conversion rate was the failure of a small subset of carriers to timely process payments. Analyst RBC issued an analyst report that same day titled "We expected some noise, but this was Iron Maiden" stating that "more than two dozen large and small insurers (by the company's attribution) are having difficulties converting and verifying new insurance customers sourced by eHealth." And, analyst Deutsche Bank issued a report that day titled "EHTH Cuts Rev[enue] & EBITDA Guidance Cut on [Near-Term] Uncertainty" stating that "back office exchange issues that are still hampering carriers (such as processing backlogs and incorrect applicant info) have resulted in delayed commission payments to EHTH." *See also id.* Based on the Company's statements, analysts believed that the issue was temporary and the conversion rate would improve to expected rates. Analyst RBC remarked in its report "[w]e expect that this will ultimately work itself out." *See also id.*

101. Huizinga's statements about the lower-than-expected conversion rate acted as partial disclosures of the truth insofar as they revealed that the Company's conversion rate had fallen far short of the defendants' May 1, 2014 representations that the conversion rate was more than 80% and revealed Lauer's June 5, 2014 representation that conversions continued to improve to have been false and misleading. ¶¶69-70, 88.

102. Nevertheless, his statements were false and misleading and omitted information necessary to make them not false or misleading insofar as they provided investors the impression that defendants maintained sufficient visibility into conversions to provide a basis for the represented conversion rate and that the primary source of the shortfall was the carrier's fault. Huizinga failed to disclose that visibility into conversion was insufficient to support his representation of the specific

shortfall to the Company's IFP conversion rate and failed to admit that the primary cause was the Company's own failure to convert applications to paying members. ¶¶146-149. Moreover, as explained in ¶¶52-56, 72, 90 above, many of EHTH's IFP customers had submitted applications for the same policy through multiple insurance brokers since the start of the first ACA open enrollment period. As also explained above in ¶¶54, 72, 90, carriers would only credit one broker in this circumstance, and the delta between accepted and enrolled members was so noticeable that the VP of Carrier Relations and his staff had sought solutions to this problem before the open enrollment period ended.

103. **Churn.** During the question and answer session of the 2Q14 earnings call, William Blair analyst Adam Klauber asked whether churn had normalized, grown higher, or was similar to where it was in 1Q14. Huizinga responded that membership churn was a bit lower than it had been in 1Q14 and in line with the Company's expectations:

> Our view of churn is that it's a little bit lower than what we saw in Q1. We still have – this is on a look-back. So, we still have a few more months before we get a final look at the whole period across Q1 and Q2. But looking at our collections of cash and looking at revenue, things look to be in line right now.

104. Jefferies analyst Dave Styblo asked defendants to explain the apparent discrepancy between the purportedly low churn levels and the absence of reported membership growth. Huizinga again represented that the Company's churn rate and other growth rates were not out of the ordinary. When Styblo explained that he had thought churn would be lower in 2Q14, Huizinga reaffirmed that churn and other growth rate metrics in 2Q14 were in line with the Company's norms.

> [Huizinga:] As we've described, our growth rates in our submitted applications are high and there is nothing – there is no metric that is out of the ordinary there in terms of churn rates and our growth rates. It's fairly – yes, I mean – yes, just cut off of the quarter when things were closed out and become paying members could be slightly different year-to-year. I mean that's the only way I guess I could explain that.
>
> * * *
>
> [Styblo:] Understood. But I guess I would assume you would have had a quite [sic] a few submitted apps in the fourth quarter that would have bled over to the first quarter and then obviously we saw a decline because of higher churn on the base. So I thought this quarter that churn is out and then we'd have a stronger sequential movement. Are you suggesting now that all these submitted apps are going to show up in the third quarter as members and we should have stronger membership growth then?

> [Huizinga:] No, I'm not trying to say that. It may be a cut off at the front end or it's – the metrics that we're seeing are for the quarter itself are in line with our norms in terms of churn and so forth. So I can't chalk that up to any kind of change in churn or anything like that.

105. Huizinga's representations continued to give investors the impression that the Company retained visibility into churn, and analysts credited his representations. For example, in its July 31 report, analyst SunTrust stated, "[d]uring the quarter the company experienced typical levels of churn." *See also* §VIII.B.3.

106. Huizinga's representations that churn was lower than 1Q14 and that churn and growth rates were in line with expectations were false and misleading and omitted information necessary to make them not false or misleading. Defendants would later admit that the first ACA open enrollment period had changed churn rates so significantly that defendants no longer had the visibility into churn sufficient to provide a reasonable basis for issuing guidance. Defendants would also later state that more time needed to pass to give accurate assessments of churn. ¶¶147-148, 152. Huizinga failed to disclose that the Company's visibility into churn was impaired.

107. **Membership.** It follows from defendants' lack of visibility into churn and conversion that the membership numbers they reported on July 30, 2014 were false and misleading or omitted material information necessary to make them not false and misleading. The press release represented that total estimated membership for IFP products as of June 30, 2014 remained essentially flat year over year at 751,000, a slight increase from 748,000 as of June 30, 2013, and that total estimated membership as of June 30, 2014 increased 14% year over year to 1,248,800 members, from 1,091,400 as of June 30, 2013.

108. Defendants' reported IFP and total membership numbers were false and misleading and omitted information necessary to make them not false or misleading for the same reasons as the 1Q14 membership estimates defendants provided on May 1, 2014 were: namely that because defendants lacked visibility into churn and conversion, the number of reported memberships lacked a reasonable basis. *See* ¶¶78-79.

109. **Guidance.** Because defendants did not disclose their lack of visibility into churn and conversion, the guidance announced on July 30, 2014 was false and misleading or omitted material

information. In the News Release and on the earnings call, defendants announced a downward revision to the guidance they had issued previously for EHTH's FY14, including reductions of revenue guidance to between $185 and $194 million, EBITDA guidance to between $13.5 to $18.5 million, and non-GAAP net income per diluted share to between $0.30 and $0.43.

110. In prepared remarks at the beginning of the earnings call, Huizinga represented that one reason for the reduced FY14 guidance was that the conversion rate had fallen below defendants' prior misrepresentations and, due to the Company's revenue model, the ramifications of the lower conversion rate would negatively impact the Company's revenue expectations through the remainder of FY14. "We expect the revenue impact from the factors which affected out second quarter performance, including a change in product and carrier mix and lower conversions of approved applications into paying members to carry throughout the rest of the year."

111. Despite the downward guidance revision, the guidance remained knowingly or recklessly false and misleading and omitted information necessary to make it not false or misleading when issued for the same reasons the guidance provided on May 1, 2014 had been knowingly false and misleading: namely that it followed from defendants' lack of visibility into churn and conversion that the guidance lacked a reasonable basis. *See* ¶¶80-81.

112. **Risk Warnings.** The risk warnings that accompanied the Company's July 30, 2014 News Release and conference call were themselves false and misleading and omitted material information necessary to make them not false or misleading. The risk warnings that accompanied the News Release had been edited from those from the prior quarter's News Release to warn generally of risks associated with, in relevant part, "changes in consumer behaviors and their selection of individual and family health insurance products, including the selection of products for which we receive lower commissions," "eHealth's ability to timely receive and accurately predict the amount of commission payments from health insurance carriers," and "changes in member conversion rates." The July 30, 2014 earnings call was prefaced by language that had been amended to warn generally of risks and uncertainties associated with, in relevant part, "our estimates of the number of revenue generating [IFP], Medicare ancillary and small business health insurance members."

113. The July 30 earnings call also referred generally to the descriptions of risks and uncertainties described in the Company's recent Forms 10-K and 10-Q, but did not tell investors to which Form 10-K or 10-Q they should refer: "We describe these and other risks and uncertainties in our Annual Report on Form 10-K, and quarterly reports on Form 10-Q filed with the Securities and Exchange Commission, which you may access through the SEC website or from the Investor Relations section of our website." The Company's then most recent such filing, its SEC Form 10-Q for 1Q14, filed on May 9, 2014, contained verbatim the same warnings found in the Company's Form 10-K for FY14, addressed in ¶83 above.

114. Those warnings purported to alert investors to risks and contingencies that had, in fact, already occurred. They were therefore false and misleading for the same reasons as the risk warnings accompanying the May 1, 2014 News Release and earnings call, including for the reasons described in ¶84. In addition, changes in consumer behaviors in the selection of IFP policies had already occurred and were continuing to occur by June 30, 2014 and defendants had already lost the ability to accurately predict commission payments from carriers, changes in conversion rates, and the number of revenue generating IFP members. ¶¶52-56, 72, 96-97, 146-149.

115. In addition, the warnings omitted material information necessary to make them not misleading. For example, none of the warnings addressed risks to the Company's visibility into churn or conversion. They also did not warn of other risks, including those associated with the "variability in the timing of commission payments from health insurance carriers," or uncertainties associated with "expected conversion rates from submitted to approved members" – warnings added to subsequent Class Period News Releases and earnings calls. ¶¶129-130.

### D. October 30, 2014: 3Q14 Earnings Release, Conference Call, and Form 8-K Current Report

116. When defendants announced their 3Q14 financial results, they misrepresented that they had confirmed carrier fault as the source of the lower-than-expected conversion rate. Just one quarter later, however, defendants would admit that the primary cause of the low conversion rate was not carrier fault. Instead, it was the Company-specific failure to convert applicants to members. In addition, defendants continued to misrepresent that they maintained visibility into conversion and

churn. But one quarter later, defendants would reveal that they had lacked visibility into churn and conversion since early 2014.

117. On October 30, 2014, after the market closed, EHTH issued a press release and filed a Current Report on Form 8-K with the SEC announcing the Company's financial results for 3Q14. The press release, titled "eHealth, Inc. Announces Third Quarter 2014 Results," was initially distributed to the market via Marketwired. Thereafter, the release was disseminated further by other news organizations, financial analysts, investor websites, and other sources of information for investors. As a result, the information communicated in the press release became widely available to investors and reflected in the market price for EHTH securities. The release was issued by EHTH and authorized or approved by each of the Individual Defendants. Defendant Lauer was quoted in the press release. In the News Release, EHTH reported 3Q14 revenues of $41.2 million, a year-over-year decrease of 2%; and non-GAAP net income of $3.1 million, or $0.17 per diluted share, compared to 3Q13 non-GAAP net income of $1.6 million, or $0.08 per diluted share in 3Q13.

118. On October 30, 2014, after issuing the News Release, EHTH hosted a conference call to discuss the Company's 3Q14 financial results with institutional investors and analysts. Defendants Lauer and Huizinga participated in the call, along with VP of Investor Relations Kate Sidorovich. Analysts representing nine major Wall Street brokerage houses also participated in and asked questions during the conference call. The call was publicized in advance by the Company, and a webcast of the call is maintained on the Investor Relations portion of EHTH's website. Written transcripts of the call were also published and disseminated by Thomson Reuters and other sources. The contents of the call were reported by news organizations and discussed in analyst reports and on the Internet. As a result, the information communicated on the call became widely available to investors and reflected in the market price for EHTH securities.

119. **Conversion.** During the earnings call, Lauer represented that the Company had determined that the decline in the percentage of commission payments from approved applicants (*i.e.*, the decline in conversion rate) was due primarily to carrier-specific issues afflicting the industry as a whole.

> We are continuing to make progress identifying and resolving the issues that led to a decline in the percentage of approved individual and family members, for which we've received a first commission payment from carriers compared to our historical experience. Our analysis indicates that these issues lie with a subset of carriers and were driven predominantly by carrier-specific issues rather than a broad change in consumer behavior as a result of the Affordable Care Act. We also believe that payment shortfalls were not unique to eHealth and also affected other brokers that worked with these carriers. For the most part, carriers have been responsive and cooperative, working to resolve these issues. And we expect that payment rates on members who apply through our platform during this upcoming open enrollment period and get approved should increase relative to the last open enrollment period. However, it may take longer to get these rates up to past historical levels.

120. Huizinga also addressed conversion rates during the call, representing that the Company had identified that the root causes of the lower conversion rates in 1Q14 were isolated to certain carriers, that the Company was working closely to resolve these problems before the upcoming open enrollment period, and that the resulting conversion rate should improve going forward.

> During the third quarter, we were able to collect a portion of the commission payments related to these policies. More importantly, we identified some of the root causes behind the lower payment rates we experienced from our Q1 applicants. As a reminder, the conversion issues were isolated to certain carriers and we've been working with these carriers to improve the processes that cause the issues in time for the upcoming open enrollment period. This should have a favorable impact on the rates at which our approved individual and family plan members [convert] into revenue-generating members.

121. In response to these representations, SunTrust issued a report on October 30, 2014 titled "Reiterate Buy on Opportunity into Enrollment Season" in which it stated that, based on the Company's ability to identify the major causes of carrier payment issues, "next year's enrollment payment rates should increase as a result." *See also* §VIII.B.4.

122. Lauer's and Huizinga's representations blaming carriers for the low conversion rate were false and misleading and omitted information necessary to make them not false or misleading. Just one quarter later, defendants would admit that the primary cause of the lower conversion rate in 1Q14 was not the external failure of certain carriers but was instead the Company-specific inability to convert submitted applications into paying members. ¶149. The admission dovetails with the accounts provided by CW1, the regional account coordinator, who said that since the beginning of the first ACA open enrollment period, EHTH's conversion rate had fallen due to applicants' practice of submitting applications through several brokers for the same policy. ¶¶52-55. According to

CW1, carriers would only credit and provide a commission to one broker per policy. ¶54. CW1 reported that the resulting drop in the Company's conversion rate was so significant that it was frequently discussed in weekly meetings involving at least the customer relations and finance groups. ¶¶53, 55; *see also* ¶56 (CW3 said conversion was also addressed in Executive Reports). CW3 also reported that conversion was discussed among participants at weekly CREWS meetings and in Executive Reports discussed by executives during closed-door meetings. ¶¶37-38. It was the Company's inability to drive customers from acceptance to enrollment through EHTH, not carrier-related deficient processes, that primarily caused the low conversion rate.

123. **Churn.** During the earnings call, Huizinga represented that churn remained similar to what it was in 2Q14: "[D]uring the quarter we continued to experience churn in our member base, which is similar to what we observed in the second quarter of this year." Some analysts were encouraged by his brief representations about churn and conversion. For example, on October 31, 2014, Craig-Hallum issued an analyst report titled, "Feeling Better Going Into An Open Enrollment Period," stating "[e]arly signs point to better success for eHealth this year relative to last year and the potential exists for a home-run scenario." *See also* §VIII.B.4.

124. Huizinga's representation that churn similar to 2Q14 was false and misleading and omitted information necessary to make it not misleading for many of the same reasons the 1Q14 and 2Q14 churn representations were: namely that defendants' admission on February 25, 2015 that the churn rate had changed significantly due to the first ACA open enrollment period established that they lacked visibility to provide a reasonable basis for this representation. ¶¶106, 147-148, 152.

125. **Membership.** Defendants' lack of visibility into conversion and churn meant that their reported membership numbers lacked a reasonable basis. The News Release represented total estimated membership for IFP products as of September 30, 2014 was down 15% year over year at 653,700, a decrease from 765,500 on September 30, 2013, and that total estimated membership as of September 30, 2014 increased 1% year over year to 1,158,100 members, from 1,147,100 on September 30, 2013.

126. Defendants' estimates of IFP and total membership were false and misleading and omitted information required to make them not false and misleading for the same reasons reported membership was false on May 1, 2014 and July 30, 2014. *See* ¶¶78-79, 107-108.

127. **Guidance.** Because defendants lacked visibility into churn and conversion, they lacked a current basis for providing financial guidance. The News Release reaffirmed revenue guidance of between $185 and $194 million, EBITDA guidance of between $13.5 to $18.5 million, and non-GAAP net income per diluted share of between $0.30 and $0.43.

128. The Company's guidance was false and misleading and omitted information necessary to make it not false or misleading for the same reasons the guidance issued on May 1, 2014 and July 30, 2014 was false and misleading. ¶¶80-81, 109-111.

129. **Risk Warnings.** The risk warnings that accompanied the Company's October 30, 2014 News Release and conference call were themselves false and misleading. The risk warnings that accompanied the News Release had been edited to warn generally of risks associated with, in relevant part, "our membership estimates," the Company's timely receipt and accurate prediction of "the amount of commission payments from health insurance carriers," and "variability in timing of commission payments from health insurance carriers." The October 30, 2014 earnings call was prefaced by language that had been amended to warn generally of risks and uncertainties associated with, in relevant part, "expected conversion rates from submitted to approved members."

130. The October 30 earnings call also referred generally to the descriptions of risks and uncertainties described in the Company's recent Forms 10-K and 10-Q, but did not tell investors to which Forms 10-K or 10-Q they should refer: "We describe these and other risks and uncertainties in our Annual Report on Form 10-K, and quarterly reports on Form 10-Q filed with the Securities and Exchange Commission, which you may access through the SEC website or from the Investor Relations section of our website." The Company's then most recent such filing, its SEC Form 10-Q for 2Q14, filed on August 8, 2014, contained substantially similar warnings as found in the Company's Forms 10-K and 10-Q for FY14 and 1Q14, addressed in ¶¶83, 113 above. Though one header was modified, its relevant meaning was left unchanged. Whereas the May 9, 2014 Form 10-Q and March 12, 2014, Form 10-K contained a risk warning header that read, "If we are unable to

retain our members, our business and operating results would be harmed," the header had been rewritten in the August 8, 2014 Form 10-Q for 2Q14 to read, "Our revenue will be adversely impacted if our membership does not grow or if we are unable to retain our existing members."

131. Those warnings purported to alert investors to risks and contingencies that had, in fact, already occurred. They were therefore false and misleading for the same reasons as the risk warnings accompanying the May 1, 2014 and July 30, 2014 News Releases and earnings calls, including for the reasons described in ¶¶82-85, 112-115.

132. In addition, the warnings continued to omit information necessary to make them not misleading, including the risk that the Company visibility into crucial Company-specific metrics such as churn and conversion was already impaired.

## VII. CORRECTIVE DISCLOSURES AND POST CLASS-PERIOD ADMISSIONS

### A. January 14, 2015: Defendants Announce Preliminary 4Q and FY14 Financial Results

133. On January 14, 2015, defendants announced hugely disappointing preliminary IFP membership numbers and financial results for 4Q and FY14 that missed substantially even the Company's previously reduced revenue, EBITDA, and non-GAAP EPS guidance. The financial results materialized the risks associated with defendants' misrepresentations that they maintained visibility into churn and conversion and therefore had a reasonable basis for the financial guidance and reported membership they provided to investors on the Company's quarterly calls during the Class Period. As a result of the contents of defendants' preliminary announcement, investors and analysts realized that defendants' lacked visibility into churn and conversion.

134. The information communicated by defendants in the preliminary announcement caused EHTH's stock price to ***decline more than 54%***, from $20.80 at close on January 14, 2014, to $9.42 at close on January 15, 2014, on heavy volume, as artificial inflation was removed from the Company's stock price.

135. On January 14, 2015, after the market closed, EHTH issued a press release and filed a Current Report on Form 8-K with the SEC announcing the Company's preliminary financial results for 4Q and FY14. The press release, titled "eHealth, Inc. Announces Preliminary Results for the

Fourth Quarter and Fiscal Year 2014," was initially distributed to the market via Marketwired. Thereafter, the release was disseminated further by other news organizations, financial analysts, investor websites, and other sources of information for investors. As a result, the information communicated in the press release became widely available to investors and reflected in the market price for EHTH securities. The release was issued by EHTH and authorized or approved by each of the Individual Defendants. Defendants Lauer and Huizinga were quoted in the press release.

136. The press release included EHTH's financial statements for FY and 4Q14, ended December 31, 2014. The Company reported its expectation of full-year revenue of between $178 and $180 million, substantially below the Company's guidance of $185 to $194 million. It also reported its expectation that EBITDA for FY14 would be between $1.5 and $4.0 million, substantially below the Company's guidance of $13.5 to $18.5 million. And it reported its expectation of non-GAAP related losses per diluted share of between $0.13 and $0.04, substantially below guidance of non-GAAP related income per diluted share of between $0.30 to $0.40. For 4Q14, the press release announced expected revenue between $43 and $45 million, expected EBITDA between $(16.3) and $(13.8) million, and expected non-GAAP net losses per diluted share of between $0.56 and $0.47.

137. Lauer and Huizinga each attributed the miss in revenue guidance to problems in the Company's IFP business in the News Release. Lauer represented that "Our fourth quarter submitted IFP applications fell short of our expectations," while Huizinga represented that "Fourth quarter revenues and earnings were impacted" in substantial part "by a shortfall in our Individual & Family Plan sponsorship and advertising and other ancillary revenues driven by lower than expected IFP application volumes."

> Gary Lauer, chief executive officer of eHealth, stated, "During the fourth quarter, we completed a successful Medicare Annual Enrollment Period generating Medicare application growth above our expectations. As a result we spent considerably more on Medicare marketing during the fourth quarter than we planned. In our Individual & Family Plan (IFP) business we are currently in the middle of the 2015 Open Enrollment Period. Our fourth quarter submitted IFP applications fell short of our expectations, and notably we had half the number of selling days under the Open Enrollment in the fourth quarter of 2014 compared to a year ago. Because we've historically experienced consumer demand in our market increase around major application deadlines, we expect to see strong IFP application volumes during the

> second half of this Open Enrollment Period and especially in the first two weeks of February just before it ends on February 15th."
>
> * * *
>
> Stuart Huizinga, chief financial officer of eHealth, commented on the fourth quarter preliminary financial results, "Fourth quarter revenues and earnings were impacted by a shortfall in our Individual & Family Plan sponsorship and advertising and other ancillary revenues driven by lower than expected IFP application volumes and by the timing of several million dollars of Medicare revenues which were pushed out into the first quarter of 2015. In addition, fourth quarter earnings were impacted by the fact that we spent considerably more than we planned on Medicare marketing costs due primarily to stronger than expected application growth in our Medicare business. We will provide more detail on the preliminary fourth quarter results during tomorrow's conference call."

138. On January 15, 2015, after the market closed, EHTH hosted a conference call to discuss the Company's preliminary financial results for 4Q and FY14 with institutional investors and analysts. Defendants Lauer and Huizinga participated in the call, along with VP of Investor Relations Sidorovich. The list of analysts participating in the call was not made publicly available and defendants took no questions on the call. The call was publicized in advance by the Company, and a webcast of the call is maintained on the Investor Relations portion of EHTH's website. Written transcripts of the call were also published and disseminated by Thomson Reuters and other sources. The contents of the call were reported by news organizations and discussed in analyst reports and on the Internet. As a result, the information communicated on the call became widely available to investors and reflected in the market price for EHTH securities.

139. During the brief call, Lauer and Huizinga repeated the revelations made in the press release issued the previous day, namely that IFP applications were lower than anticipated, and that they expected FY14 revenues, EBITDA, and non-GAAP earnings per share to fall significantly below the annual guidance issued on July 30, 2014 and reaffirmed on October 30, 2014.

140. In response to the earnings release, analysts began to realize that, contrary to defendants' prior representations, they lacked visibility into conversion and churn. For example, on January 14, 2015, Jefferies issued an analyst report titled, "IFP Apps Disappoint in 4Q Pre-Announce: Brace For A Volatile Thursday" stating the Company "likely doesn't know how many of its applications are converting to paid members nor what churn looks like on the existing customer base," which were "two important metrics." *See* §VIII.B.5.

141. Other analysts expressed concern over defendants' failure to provide more clarity. For example, on January 14, 2015, Deutsche Bank issued an analyst report titled, "EHTH Pre-Announces Material 4Q Revenue & Earnings Shortfall," which stated that, "We expect the stock to grapple with the increasingly limited visibility into EHTH's top-line and margin trends." *See also id*. On January 15, 2015, Cowen issued an analyst report titled, "Downgrade: Uncertain Future For Individual Business," which included a section header proclaiming: "Overwhelming uncertainty about the future of the IFP business." *See id*.

### B. February 25, 2015: Defendants Announce Finalized Financial Results for 4Q and FY14

142. Just over one month later, defendants confirmed analysts' realization. Defendants revealed that the ACA had caused "pronounced deviations" in churn and conversion rates, which "changed significantly a year ago" – *i.e.*, before the start of the Class Period. As a result, defendants had lacked visibility into churn and conversion.

143. On February 25, 2015, after the market closed, EHTH issued a News Release and filed a Current Report on Form 8-K with the SEC announcing the Company's final financial results for 4Q and FY14. The News Release, titled "eHealth, Inc. Announces Fourth Quarter and Fiscal Year 2014 Results," was initially distributed to the market via Marketwired and provided, in part:

> **Fourth Quarter 2014 Results**
>
> **Revenue** – Revenue for the fourth quarter of 2014 totaled $45.0 million, a 17% decrease compared to revenue of $54.2 million for the fourth quarter of 2013. Commission revenue for the fourth quarter of 2014 totaled $38.4 million, a 13% decrease compared to commission revenue of $44.2 million for the fourth quarter of 2013. Medicare related revenue was $13.5 million for the fourth quarter of 2014, a 16% decrease compared to Medicare related revenue of $16.1 million for the fourth quarter of 2013. The decline in Medicare related revenue was partially a result of a delay in recognizing some revenue related to new Center for Medicare and Medicaid Services ("CMS") regulations prohibiting carriers from paying commissions during the fourth quarter on Medicare Advantage and Medicare Part D prescription drug plans sold during the fourth quarter with an effective date in the following year. Medicare related revenue in the fourth quarter of 2014 also reflects a decline in Medicare sponsorship and advertising revenue compared to the fourth quarter of 2013. Medicare related revenue includes Medicare commission revenue, Medicare sponsorship and advertising revenue and Medicare licensing revenue.
>
> * * *
>
> **EBITDA** – EBITDA for the fourth quarter of 2014 was $(12.9) million compared to EBITDA of $1.1 million for the fourth quarter of 2013. EBITDA is calculated by

adding stock-based compensation, depreciation and amortization expense, including intangible asset amortization expense, other expense, net and provision (benefit) for income taxes to GAAP net income (loss).

* * *

**Net Income (Loss) –** Net loss for the fourth quarter of 2014 was $19.2 million, or $(1.08) per diluted share, including an $11.5 million, or $(0.65) per diluted share provision for income taxes to record a valuation allowance against deferred tax assets, compared to net loss of $2.0 million, or $(0.11) per diluted share for the fourth quarter of 2013. Non-GAAP net loss for the fourth quarter of 2014 was $7.8 million, or $(0.44) per diluted share, compared to non-GAAP net loss of $0.3 million, or $(0.01) per diluted share for the fourth quarter of 2013. Non-GAAP net loss and non-GAAP net loss per diluted share in the fourth quarter of 2014 exclude $(0.7) million of stock-based compensation expense, $0.5 million of intangible asset amortization expense and $11.6 million of provision for income taxes, including non-cash charges of $11.5 million to establish a valuation allowance against deferred tax assets. Non-GAAP net loss and non-GAAP net loss per diluted share in the fourth quarter of 2013 exclude $2.4 million of stock-based compensation expense and $0.4 million of intangible asset amortization expense, less $1.1 million for related income tax benefit.

* * *

**Fiscal 2014 Results**

**Revenue –** Revenue for the year ended December 31, 2014 totaled $179.7 million, remaining flat compared to revenue of $179.2 million for the year ended December 31, 2013. Commission revenue for the year ended December 31, 2014 totaled $158.6 million, a 3% increase compared to commission revenue of $153.4 million for the year ended December 31, 2013. Medicare related revenue was $44.5 million for the year ended December 31, 2014, a 15% increase compared to Medicare related revenue of $38.8 million for the year ended December 31, 2013.

* * *

**EBITDA –** EBITDA for the year ended December 31, 2014 was $4.8 million compared to EBITDA of $16.2 million for the year ended December 31, 2013. EBITDA is calculated by adding stock-based compensation, depreciation and amortization expense, including intangible asset amortization expense, other expense, net and provision (benefit) for income taxes to GAAP net income (loss).

* * *

**Net Income (Loss)** - Net loss for the year ended December 31, 2014 was $16.2 million, or $(0.88) per diluted share, including an $11.5 million, or $(0.63) per diluted share provision for income taxes to record a valuation allowance against deferred tax assets, compared to net income of $1.7 million, or $0.09 per diluted share for the year ended December 31, 2013. Non-GAAP net loss for the year ended December 31, 2014 was $0.2 million, or $(0.01) per diluted share, compared to non-GAAP net income of $7.3 million, or $0.37 per diluted share for the year ended December 31, 2013. Non-GAAP net loss and non-GAAP net loss per diluted share in the year ended December 31, 2014 exclude $5.9 million of stock-based compensation expense, $1.5 million of intangible asset amortization expense and $8.6 million of provision for income tax, including non-cash charges of $11.5 million

> to establish a valuation allowance against deferred tax assets. Non-GAAP net income and non-GAAP net income per diluted share in the year ended December 31, 2013 exclude $7.8 million of stock-based compensation expense and $1.4 million of intangible asset amortization expense, less $3.7 million for related income tax benefit.

144. On February 25, 2015, after the market closed, EHTH hosted a conference call to discuss the Company's 4Q14 financial results with institutional investors and analysts. Defendants Lauer and Huizinga participated in the call, along with VP of Investor Relations Sidorovich. Analysts representing five major Wall Street brokerage houses also participated in and asked questions during the conference call. The call was publicized in advance by the Company, and a webcast of the call is maintained on the Investor Relations portion of EHTH's website. Written transcripts of the call were also published and disseminated by Thomson Reuters and other sources. The contents of the call were reported by news organizations and discussed in analyst reports and on the Internet. As a result, the information communicated on the call became widely available to investors and reflected in the market price for EHTH securities.

145. During prepared remarks that opened the conference call, Lauer confirmed that the Company's daily IFP application volume during the open enrollment period had "declined substantially" from the year before. Huizinga revealed that 4Q14 IFP submitted applications declined 41%, the number of IFP members as of the end of 4Q14 had declined 29%, and that total membership had declined by 10% compared to 4Q13.

146. Huizinga confirmed the importance of conversion and churn to the Company's forecast and revealed that "significant changes in our industry" due to the ACA had caused "pronounced deviations" in those "important drivers" of the Company's guidance:

> In addition, two important drivers of our 2015 financial forecast are the rate at which the individuals on applications submitted during the open enrollment period will convert into paying members, and the attrition within our existing individual member base during the open enrollment period. Given the significant changes in our industry as a result of the Affordable Care Act, we've seen pronounced deviations from historical averages in these previously stable metrics.

147. Due to their lack of visibility into the "two important drivers," churn and conversion, defendants announced they would not be able to issue financial guidance. "This year," said Huizinga, "we'll be taking additional time to digest all the relevant data points around our open

enrollment period performance and membership trends before we finalize our 2015 forecast." Since this statement on the February 25, 2015 earnings call, EHTH has not issued any financial guidance.

148. In response to a question from SunTrust analyst Tobey Sommer regarding which specific variables the Company wanted more clarity on before providing guidance, Huizinga revealed that he needed to see how churn rates and conversions develop because they had changed "significantly" from historical patterns "a year ago":

> Well, I think we also pointed to the fact that there is [sic] metrics that we would like to wait to see how those develop here after the open enrollment period ends, to see the churn, to see the submitted application to pay conversions, something that changed significantly a year ago. We want to see those numbers this year.

149. In response to a question from Stifel Nicolaus analyst Steve Rubis about whether investors should be concerned that the Company could face another issue with low conversion rates like it had during 2Q14, Huizinga revealed that the main issue then had not been related to carriers' inability to timely process applications and properly allocate commissions, but in fact was rather the Company's specific inability to drive "conversion from submitted application to a paying member."

> [Rubis:] . . . [G]iven that you haven't provided guidance and there's a lot of moving parts, should investors be concerned that you could face another issue around commission conversion, like you did in the second quarter of last year? Or have you largely been able to fix whatever issue was driving that?
>
> [Huizinga:] Well, I think the main issue for us was a conversion from submitted application to a paying member. We took a lot of steps to improve that. It's way too early for us to be able to see the impact of that. But I don't want to steer you towards we've improved it at this point, but we definitely took steps to do that.

150. Analysts castigated defendants for the Company's lack of visibility into conversion and churn. Deutsche Bank issued an analyst report on February 26, 2105, titled "4Q14 Wrap: IFP Weather Forecast Calls for Near Zero Visibility" stating that "it has become clear that the company has extremely limited visibility into the IFP franchise at this point." RBC also issued a report that day titled, "Poor application volume + member churn = an upside down expense model," and stated it was neither a surprise nor a concern that the Company did not offer guidance because "financial projections have been a shot in the dark anyway for the first two open enrollment periods." *See also* §VIII.B.6.

151. EHTH's stock price fell an additional 7%, from $10.13 to $9.41. To date, defendants have not provided financial guidance for EHTH since announcing they need more time to gain greater visibility into churn and conversion.

152. On March 19, 2015, one day after visiting with Lauer and Huizinga, SunTrust issued a report titled "Takeaways From HQ Visit." SunTrust reported that the Company revealed that it probably would not be possible to fully assess the outcome of the 2015 open enrollment period, which had ended on February 15, 2015, until June because "under The Affordable Care Act, more time needs to pass to accurately evaluate business activity that occurred months earlier. It takes time to hear back from carriers about conversion of submitted applications and also to ascertain churn."

## VIII. ADDITIONAL ALLEGATIONS OF RELIANCE AND MATERIALITY, LOSS CAUSATION, AND DAMAGES

### A. Presumption of Reliance (Fraud on the Market Allegations)

153. Through the efficient operation of the markets in which EHTH common stock was publicly traded, plaintiffs and the other members of the proposed Class may be presumed to have relied upon each of the false and misleading statements alleged herein.

154. At all relevant times, the market for EHTH's common stock was an efficient market for the following reasons, among others:

(a) EHTH's stock met the requirements for listing, and was listed and actively traded on the NASDAQ Exchange, a highly efficient and automated market;

(b) As a regulated issuer, EHTH filed periodic public reports with the SEC and the NASDAQ Exchange and was, at all times alleged herein, eligible to file a Form S-3 with the SEC;

(c) EHTH regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services, publications on its website and other Internet sites, and through other wide-ranging public disclosures, such as through conference calls, communications with the financial press and other similar reporting services;

(d) During the Class Period, EHTH was followed by securities analysts employed by major brokerage firms including Craig-Hallum, Deutsche Bank, Jefferies, RBC, SunTrust Robinson Humphrey, William Blair & Co., and others. Analysts employed by each of these firms regularly wrote reports based upon the publicly available information disseminated by defendants about EHTH. These reports were distributed to the sales force and certain customers of their respective brokerage firms;

(e) Institutions collectively owned more than 85% of EHTH's outstanding shares. Each of these institutions regularly analyzed and reported on the publicly available information about EHTH and its operations; and

(f) During the Class Period, the average daily trading volume of EHTH common stock was more than 351,500 shares.

155. Through the foregoing mechanisms, the information publicly disseminated by defendants about the Company and its operations, and the import thereof, became widely available to and was acted upon by investors in the marketplace such that, as a result of their transactions in EHTH stock, the information disseminated by defendants, including the false and misleading statements described above, became incorporated into and were reflected by the market price of EHTH's common stock.

156. Under these circumstances, all purchasers of EHTH's common stock during the Class Period are presumed to have relied upon the false and misleading statements and material omissions alleged herein.

**B. Theory of Materiality, Loss Causation, and Damages**

157. Each member of the proposed Class suffered economic losses as a direct and proximate result of the fraud alleged herein. Each Class member suffered similar injury as a result of: (i) their purchase of EHTH's common stock at prices higher than they would have been had defendants made truthful and complete disclosures of information about the Company as necessary to prevent the statements, omissions and course of business alleged herein from being materially false or misleading to investors; and (ii) their retention of those shares through the date of one or more declines in the market price of those shares that was caused by the revelation of business

conditions and risks concealed from investors by defendants' scheme to defraud or the financial consequences of their concealed actions.

158. The misrepresentations and omissions alleged herein impacted the public trading price for EHTH's common stock by causing it to trade at a price higher than it would have had the facts, risks and conditions concealed by defendants' fraud become known sooner than it did. The impact on EHTH's stock price occurred by increasing the trading price of EHTH stock at the time of the misrepresentation or by preventing a price decline that would have occurred at that time with the full disclosure of the truth, or both.

159. The facts, risks, and conditions concealed from investors by defendants' scheme to defraud reached the market through several partial disclosures. Though each of the disclosures was incomplete, each revealed some of the business conditions concealed by defendants' fraud scheme and the concealed materialization of risks to its operations, leading to price declines that partially corrected EHTH's stock price by reducing the extent to which it had been inflated by defendants' fraudulent scheme, thereby injuring Lead Plaintiff and other members of the Class who had purchased EHTH securities during the Class Period at prices that had been artificially inflated by the fraudulent course of business and misleading statements and omissions alleged herein.

160. The fraud-related events that impacted the price of EHTH's common stock include those identified in the chart below, which identifies each event, the change in EHTH's stock price during the first trading day after the event, and, for purposes of comparison, the percentage change in the S&P 500 Index on the same date. The chart also identifies the final corrective event that resulted in the removal of all artificial inflation due to defendants' Class Period misrepresentations.

| Date | Event[3] | eHealth Δ | | S&P 500 Δ |
|---|---|---|---|---|
| | | $ | % | % |
| 5/1/14 | 1Q14 Earnings Report | ($5.12) | (12.2%) | (0.1%) |
| 6/5/14 | eHealth Presentation at Jefferies Global Healthcare Conference[4] | ($5.09) | (13.1%) | 0% |
| 7/30/14 | 2Q14 Earnings Report | ($10.95) | (34.6%) | (2%) |
| 10/30/14 | 3Q14 Earnings Report | $2.35 | 10.4% | 1.2% |
| 1/14/15 | 4Q/FY14 Earnings Preliminary Announcement | ($11.38) | (54.7%) | (0.9%) |
| 2/25/15 | 4Q/FY14 Final Earnings Report | ($0.72) | (7.1%) | (0.1%) |

**1. May 1, 2014 Inflationary Event**

161. On May 1, 2014, after the market closed, EHTH issued its 1Q14 News Release. At 5:00 p.m. ET on the same day, EHTH initiated its 1Q14 investor conference call. EHTH's 1Q14 Current Report on Form 8-K was also filed with the SEC on the same day.

162. EHTH's News Release, conference call and Form 8-K contained guidance and membership metrics that were false and misleading or that omitted information necessary to make them not false or misleading. The conference call contained statements concerning the Company's visibility into conversion and churn rates and lower member acquisition costs that were false and misleading or omitted information necessary to make them not false or misleading.

163. Defendants did not disclose information necessary to make their statements not misleading under the circumstances, including that they lacked visibility into churn and conversion; that their lack of visibility into churn and conversion rendered false and baseless their guidance and membership metrics; or that they were spending more to build membership than in the past.

164. EHTH's stock price declined 12%, from $41.86 at the close of trading on May 1, 2014 to $36.74 at the close on May 2, 2014, on heightened volume of 1,581,600 shares, more than

---

[3] The list of events identified herein is necessarily preliminary, and based upon Lead Plaintiff's analysis and investigation to date. Upon further investigation and discovery and additional analysis, Lead Plaintiff may change, alter or amend their theory of damages, including by identifying additional inflationary and corrective events that caused or contributed to the damages claimed in this action, or by using other industry indices or competitor stock price data to establish more precisely the magnitude of the Company-specific change arising from those events.

[4] Jefferies issued an analyst report about EHTH's presentation at the Global Healthcare Conference early on June 10, 2014. The price decline and index comparison are based on the change in closing price from June 9, 2014 to June 10, 2014.

four times its average daily volume during the Class Period, in reaction to slightly disappointing 1Q14 revenues. Investors believed the disappointing revenues related primarily to the new seasonality imposed by the ACA.

165. Despite the decline, defendants' false and misleading statements regarding guidance, membership metrics, churn, conversion, and lower member acquisition costs caused the Company's stock price to become artificially inflated. But for those false and misleading statements and material omissions, EHTH's stock price would have declined substantially further than it did on May 2, 2014.

166. Analysts reacted to the Company's representations about conversion, churn, and lower customer acquisition costs.

(a) On May 1, 2014, SunTrust issued a report titled "1Q Results; New Seasonality Evident." The report commented, "The close ratio [*i.e.*, conversion rate] improved from 55%-60% historically to 80% based on January data, which should translate into lower customer acquisition cost and could improve unit economics over the customer lifetime." The report explained that the stock price dropped because "investors were not fully prepared for new and developing seasonality for sales and profitability, but we are convinced that the underlying trajectory will prove favorable for high growth."

(b) On May 2, 2014, Jefferies issued a report titled "With 1Q Done, the Market can Finally Focus on [Long-Term] Growth." The report commented favorably on the Company's representations about churn, which had "de-risk[ed] investors' concern about an attrition spike." While the report noted that full "transparency on conversions and churn in the last two quarters is lacking," it expressed confidence that the Company had passed through a critical time period without significant churn and could now look ahead to growth drivers. The report also focused on an expected "delayed benefit in 2Q from a late March application surge" in anticipation that applicants would, as the Company represented, convert to members at a rate over 80%.

(c) On May 2, 2014, Deutsche Bank issued a report titled "1Q Largely In Line; 2014 Guidance Reaffirmed." The report noted the Company's commentary on churn, explaining "[c]hurn was better than we expected." Deutsche Bank also focused on the Company's prospects for

2Q14, given the anticipated spillover effect of 1Q14 applicants who would likely be approved and convert to paying members in the next quarter: "The company reported another quarter with strong IFP submitted app volumes but approved members were below our model as 50% of apps came in during the final two weeks of 1Q and likely won't be approved until 2Q."

(d) On May 2, 2014, RBC issued a report titled "Plowing through the turbulence to drive continued growth." RBC analysts reported that EHTH's membership churn was "well below levels that concerned investors ha[d] presumed may have been the case." The report also noted that "eHealth's application conversion rate was up to approximately 80% in 1Q/14 – up from historical rates of approximately 60%. The result of this increase is an increase in the incremental value of each application as the potential for conversion to a revenue producing membership is considerably higher than historical precedent." The report revised slightly downward its revenue targets and earnings estimates due to the magnitude of the Company's recent investments but reaffirmed the analysts' belief that "the magnitude of the opportunity available to eHealth is substantial and deserving of these increased investment levels to position the company appropriately for long-term revenue and earnings growth."

167. EHTH's false and misleading statements and material omissions about guidance, churn, conversion, membership, and the lower cost of member acquisition caused the Company's stock to trade at a higher price on and after May 2, 2014 than it otherwise would have, thereby creating or maintaining fraud-related inflation in EHTH's stock price.

**2. June 5, 2014 Corrective and Inflationary Event**

168. On June 5, 2014, at 8:00 a.m. ET, Lauer gave a presentation at the Jefferies Global Healthcare Conference. During the presentation, Lauer represented that the Company's conversions continued to increase, which was false and misleading and omitted facts necessary to make it not false or misleading. Lauer did not disclose information necessary to make his statements not misleading under the circumstances, including that defendants lacked visibility into conversions.

169. On June 10, 2014, analysts at Jefferies issued a report concerning Lauer's June 5, 2014 presentation titled "Downgrading to Hold: Less Confident in Exchange Opportunity," which recounted Lauer's presentation. As indicated by the title, the report's primary concern was Lauer's

representation that the federal government was not making a priority EHTH's ability to connect to the federal data hub, which would hamper the Company's ability to enroll applicants in subsidized insurance plans.

170. The Company's stock price declined 13%, from $39.00 at the close of trading on June 9, 2014 to $33.91 at the close on June 10, 2014, on heightened volume of 1,709,300 shares, nearly five times its average daily volume during the Class Period. According to an article published that day in *TheStreet*, EHTH's share price decline resulted from investor reaction to the fact of and reason for Jefferies' downgrade.

171. However, EHTH's stock price remained artificially inflated due to Lauer's false and misleading statement that conversions continued to rise and his omission of the fact that the Company lacked the visibility necessary to substantiate that representation. But for that false and misleading statement and the omission of information necessary to make it not false and misleading, EHTH's stock price would have declined further on June 10, 2014.

172. Lauer's false and misleading statement and material omission caused the Company's stock to trade at a higher price on and after June 10, 2014 than it otherwise would have, thereby creating or maintaining fraud-related inflation in EHTH's stock price.

**3. July 30, 2014 Partial Corrective and Inflationary Event**

173. On July 30, 2014, after the market closed, EHTH issued its 2Q14 News Release. At 5:00 p.m. ET on the same day, EHTH initiated its 2Q14 investor conference call. EHTH's 2Q14 Current Report on Form 8-K was also filed with the SEC the same day.

174. In the News Release and Form 8-K and on the conference call, defendants provided false and misleading guidance and membership metrics, and omitted information necessary to make the guidance and membership metrics not misleading. During the conference call defendants falsely and misleadingly represented that the primary cause of the lower conversion rate was the carriers' inability to timely process applications and pay commissions to brokers, and omitted information necessary to make this statement not false or misleading. Also during the conference call, the Company made statements about churn being lower than it had been in the prior quarter, which was false and misleading and omitted facts necessary to make it not false or misleading.

175. Defendants did not disclose information necessary to make their statements not misleading under the circumstances, including that they lacked visibility into churn and conversion; that their lack of visibility into churn and conversion rendered baseless their guidance and membership metrics; and that the Company's specific failure to drive conversions of a higher rate was the primary cause of lower than expected conversion rates and the disappointing financial results.

176. EHTH's common stock dropped 35%, from $31.65 at the close of trading on July 30, 2014 to $20.70 at the close on July 31, 2014 on heightened volume of 4,427,900 shares, more than 12 times its average daily volume during the Class Period. This drop caused some, but not all, of the fraud-caused inflation from EHTH's share price to dissipate.

177. The July 31, 2014 stock price decline was driven primarily by disappointing financial results due to lower-than-expected IFP membership results caused by the low conversion rate announced in the 2Q14 News Release and conference call. However, the stock price remained inflated by defendants' false and misleading statements and omissions, including those about the reason for the lower-than-expected IFP conversion rate. Some analysts credited the Company's representations that the lower conversion rate was primarily the carriers' fault, while others said the Company did not appear to know the cause of the lower conversion rate. The stock price also remained inflated due to defendants' misrepresentations concerning churn. Analysts noted the Company's representation that churn remained within expectations and lower than during 1Q14.

178. On July 31, 2014, RBC issued a report titled "We expected some noise, but this was Iron Maiden." The report noted concern about the "lack of growth in a period of unprecedented new membership opportunity" but credited defendants' representation that the disappointing IFP conversion rate resulted from fault with the carriers, not with the Company:

> [M]ore than two dozen large and small insurers (by the company's attribution) are having difficulties converting and verifying new insurance customers sourced by eHealth and attributing/paying commissions due the company. We expect that this will ultimately work itself out, . . . but closing the loop is critical to the business of eHealth.

(a) On July 31, 2014, SunTrust issued a report titled "Guidance Lowered On Payments; Thesis Remains Intact." The report credited defendants' representation that carriers were

to blame for the low payment (*i.e.*, conversion) rates: "Management estimates that a couple dozen of the 150 carriers they work with saw these unusually low payment rates." The report also noted favorably that churn remained typical: "During the quarter the company experienced typical levels of churn, strong submitted applications, and solid approval rates . . . ."

(b) On July 31, 2014, Jefferies issued report titled "Disastrous 2Q Update Will Pressure Stock." The report commented that membership, revenue, guidance reduction were all negatives and indicated concern that defendants could not explain decline in IFP membership arising from the lower conversion rate. It noted that "mgmt. can't fully explain the IFP decline" and explained "[IFP] apps aren't converting into paid members either because 1) they have decided not to pay premiums; and/or 2) [carrier] processing issues that may never be resolved."

(c) On July 31, 2014, Deutsche Bank issued a report titled "EHTH Cuts Rev[enue] & EBITDA Guidance Cut on [Near-Term] Uncertainty." The report noted that revenues fell short of expectations "as declining conversion rates" were among the "significant headwinds" in the quarter. Analysts at Deutsche Bank interpreted the conversion rate decline as having two causes, the failure of open enrollment applicants to pay premiums and carriers' back office issues.

> IFP conversions have been in the low 70% range versus the high 80% range that EHTH observed historically as individuals applying during the open enrollment in 1Q failed to pay their premiums. Additionally, the back office exchange issues that are still hampering carriers (such as processing backlogs and incorrect applicant info) have resulted in delayed commission payments to EHTH.

(d) On July 31, 2014, Craig-Hallum issued a report titled "A Significant Opportunity Overshadowed By Some Significant Question Marks. Lowering Rating To Hold, Reducing Price Target to $27." The report lowered their rating of EHTH's stock to hold due to the lower-than-expected enrollment numbers as approved IFP applicants "have apparently decided not to move forward with their policies." The report continued, "many customers that eHealth believed to have enrolled in IFP plans before the close of the enrollment period have yet to show up as paying customers and the company is getting little help from carriers to determine why."

179. Had EHTH disclosed that they did not know the reason for the low conversion rate, that they lacked visibility into conversion and churn, and that they therefore lacked a reasonable

basis for issuing guidance and reporting membership metrics, its stock price would have fallen substantially further than it did on July 31, 2014.

180. The disclosure on the 2Q14 News Release and conference call of the disappointing financial results and IFP metrics and reduced financial guidance based on a lower conversion rate of IFP applications then investors had been led to expect was therefore only a partial corrective disclosure of the information concealed by the fraud alleged herein. The 2Q14 disclosures reflected a partial manifestation of the risk due to the guidance reduction and conversion rates lower than defendants' prior representations, but defendants continued to mislead investors about their ability to determine the reason for the lower conversion rates as well as their ability to estimate conversion and churn, and by issuing guidance without a reasonable basis.

181. The 2Q14 News Release, conference call, and Form 8-K stopped short of being a complete corrective disclosure, because defendants did not disclose that they lacked the visibility required to estimate churn and conversion rates, and therefore to explain the reason for lower-than-expected conversion, calculate membership metrics, and provide financial guidance. Defendants' failure to disclose these facts caused EHTH's stock price to trade at a higher price on and after July 31, 2014 than it otherwise would have, thereby creating or maintaining fraud-related inflation in EHTH's stock price.

**4. October 30, 2014 Inflationary Event**

182. On October 30, 2014, after the market closed, EHTH issued its 3Q14 News Release. At 5:00 p.m. ET on the same day, EHTH initiated its 3Q14 investor conference call. EHTH's 3Q14 Current Report on Form 8-K was also filed with the SEC the same day.

183. The News Release, conference call, and Form 8-K each contained statements that were false and misleading or omitted facts necessary to make them not misleading. The news release and Form 8-K each contained financial guidance and membership metrics that were false and misleading and omitted information necessary to make them not false or misleading. The conference call contained statements representing that the source of the Company's lower-than-expected conversion rate was certain carriers' inability to timely process applications and properly allocate

commissions, and that churn was similar to what it had been in the prior quarter. These statements were false and misleading and omitted information necessary to make them not false or misleading.

184. Defendants did not disclose information necessary to make their statements not misleading under the circumstances, including that they lacked visibility into churn and conversion; that their lack of visibility into churn and conversion rendered baseless their guidance and membership metrics; and that the lower-than-expected conversion rate was due primarily to the Company's own failure to convert applicants to paying members.

185. EHTH's common stock rose 10%, from $22.60 at the close of trading on October 30, 2014 to $24.95 at the close on October 31, 2014 on volume of 499,350 shares, nearly 1.5 times its average daily volume during the Class Period.

186. Analysts credited defendants' representations about the cause of their lower-than-expected conversion rate. On October 30, 2014, SunTrust issued a report titled "Reiterate Buy on Opportunity into Enrollment Season." The report said that, based on the Company's ability to identify the major causes of the carrier payment issues, "next year's enrollment payment rates should increase as a result." On October, 31, 2014, Craig-Hallum issued a report titled "Feeling Better Going Into Open Enrollment Period. Maintaining Hold Rating And $27 Price Target." The report said that "Early signs point to better success for eHealth this year relative to last year and the potential exists for a home run scenario."

187. Had defendants disclosed that they lacked visibility into conversion and churn; that they lacked a reasonable basis for issuing guidance and reporting membership metrics; and that, in truth, the primary cause of the lower-than-expected conversion rate was the Company-specific failure to convert applicants to paying members, not the industry-wide failure of carriers to timely process applications and properly allocate commissions, EHTH's stock price would have declined substantially, not risen, on October 31, 2014.

188. Defendants' failure to disclose their lack of visibility into churn and conversion and their resulting inability to calculate membership metrics and financial guidance, as well as the failure to disclose the primary reason for low conversion rates was in truth the Company's own failures,

caused EHTH's stock price to trade at a higher price on and after October 31, 2014 than it otherwise would have, thereby creating or maintaining fraud-related inflation in EHTH's stock price.

**5. January 14, 2015 Corrective Event**

189. On January 14, 2015, after the market closed, EHTH issued a News Release announcing its preliminary 4Q and FY14 financial results. EHTH's Preliminary 4Q and FY14 Report on Form 8-K was also filed with the SEC the same day. At 9:00 a.m. ET the following day, January 15, 2015, EHTH initiated its Preliminary 4Q and FY14 results investor conference call.

190. The News Release, conference call, and Form 8-K reported that the Company expected FY14 revenues to miss financial guidance for revenues, EBITDA, and non-GAAP related earnings per share. Defendants provided minimal explanation in the News Release and Form 8-K and on the conference call for the disappointing results, but attributed them primarily to IFP-related shortfalls.

191. Analysts reacted swiftly and negatively. On January 14, 2015, Jefferies issued a report titled "IFP Apps Disappoint in 4Q Pre-Announce: Brace For A Volatile Thursday." The report questioned whether the Company had any basis for its earlier representations that it had visibility into churn and conversion rates:

> IFP applications (the most important leading indicator) were 50% below our expectation. Low visibility into other key metrics (app conversions; churn) will also likely weigh on the stock in the near-term.
>
> * * *
>
> **Low visibility on other key metrics means we still don't have a complete view.** Applications are only one part of the puzzle. They provide a gross view of membership, but we don't know other important parts that bridge to ending membership, which is what pays the bills. More specifically, EHTH likely doesn't know how many of its applications are converting to paid members nor what churn looks like on the existing customer base. . . .

192. EHTH's stock price dropped almost 55%, from $20.80 at the close of trading on January 14, 2014 to $9.42 at the close of trading on January 15, 2015 on exceptional volume of 7,435,000 shares, more than 21 times its average daily volume during the Class Period.

193. The January 15, 2015 stock price decline was caused by the information communicated in the January 14, 2015 News Release and Form 8-K, and the January 15, 2015

conference call, the internal business conditions that led to the negative conditions reported therein, and the manifestation of risks, the existence and/or magnitude of which had previously been concealed from investors. The disclosure eliminated fraud-caused inflation from EHTH's stock price.

**6. February 25, 2015 Corrective Event**

194. On February 25, 2015, after the market closed, EHTH issued a News Release announcing its final 4Q and FY14 financial results. At 5:00 p.m. ET on the same day, EHTH initiated its 4Q and FY14 financial results investor conference call. EHTH's Final 4Q and FY14 Current Report on Form 8-K was also filed with the SEC the same day.

195. The News Release, conference call, and Form 8-K confirmed that the Company's FY14 revenues had missed financial guidance for revenues, EBITDA, and non-GAAP related earnings per share. The News Release provided:

***Fourth Quarter 2014 Overview***

- Revenue of $45.0 million, a decrease of 17% compared to the fourth quarter of 2013
- GAAP operating loss of $13.8 million compared to GAAP operating loss of $2.6 million for the fourth quarter of 2013
- GAAP net loss of $19.2 million, or $(1.08) per diluted share, including a $11.5 million, or $(0.65) per diluted share provision for income taxes to record a valuation allowance against deferred tax assets, compared to GAAP net loss of $2.0 million, or $(0.11) per diluted share for the fourth quarter of 2013
- Non-GAAP net loss of $7.8 million, or $(0.44) per diluted share, compared to non-GAAP net loss of $0.3 million, or $(0.01) per diluted share for the fourth quarter of 2013
- Total estimated members decreased 10% compared to the fourth quarter of 2013
- Submitted applications for Medicare Advantage and Medicare Supplement products combined increased 46% compared to the fourth quarter of 2013.
- Submitted applications for Individual & Family Plan products decreased 41% compared to the fourth quarter of 2013
- Cash flow from operations was an outflow of $4.1 million compared to cash flow from operations of $6.2 million in the fourth quarter of 2013

* * *

**Fiscal 2014 Results**

**Revenue** - Revenue for the year ended December 31, 2014 totaled $179.7 million, remaining flat compared to revenue of $179.2 million for the year ended December 31, 2013. Commission revenue for the year ended December 31, 2014 totaled $158.6 million, a 3% increase compared to commission revenue of $153.4 million for the year ended December 31, 2013. Medicare related revenue was $44.5 million for the year ended December 31, 2014, a 15% increase compared to Medicare related revenue of $38.8 million for the year ended December 31, 2013.

* * *

**EBITDA** - EBITDA for the year ended December 31, 2014 was $4.8 million compared to EBITDA of $16.2 million for the year ended December 31, 2013. EBITDA is calculated by adding stock-based compensation, depreciation and amortization expense, including intangible asset amortization expense, other expense, net and provision (benefit) for income taxes to GAAP net income (loss).

* * *

**Net Income (Loss)** - Net loss for the year ended December 31, 2014 was $16.2 million, or $(0.88) per diluted share, including an $11.5 million, or $(0.63) per diluted share provision for income taxes to record a valuation allowance against deferred tax assets, compared to net income of $1.7 million, or $0.09 per diluted share for the year ended December 31, 2013. Non-GAAP net loss for the year ended December 31, 2014 was $0.2 million, or $(0.01) per diluted share, compared to non-GAAP net income of $7.3 million, or $0.37 per diluted share for the year ended December 31, 2013. Non-GAAP net loss and non-GAAP net loss per diluted share in the year ended December 31, 2014 exclude $5.9 million of stock-based compensation expense, $1.5 million of intangible asset amortization expense and $8.6 million of provision for income tax, including non-cash charges of $11.5 million to establish a valuation allowance against deferred tax assets. Non-GAAP net income and non-GAAP net income per diluted share in the year ended December 31, 2013 exclude $7.8 million of stock-based compensation expense and $1.4 million of intangible asset amortization expense, less $3.7 million for related income tax benefit.

196. During the conference call, defendants provided additional information about the reasons for the disappointing results. Lauer revealed that the Company would no longer issue guidance until it had better visibility into conversion and retention (*i.e.* churn):

Now I'd like to make some comments about guidance. We've always provided expected annual ranges for revenue, EBITDA, net income per diluted share, and stock-based compensation expense at the time we provided our fourth-quarter financial results. However, as we are taking steps to adjust our cost structure, and considering all the changes in the marketplace -- including another change to the 2016 open enrollment dates, and an introduction of the new special enrollment period this March, as well as other possible policy changes, such as the upcoming decision by the Supreme Court in the King vs. Burwell case -- we don't feel that we are now in a position to provide guidance.

We also like to obtain more data that would be helpful to us in forecasting 2015 individual and family plan membership before we provide annual guidance. As

> you know, key factors that drive membership growth and future commission revenues are -- our conversion rates from a submitted application to a paying member, and the retention rates in our existing individual and family plan membership base.
>
> Given significant recent changes in our market, we are going to take additional time to analyze the open enrollment data and get better visibility into these metrics. We plan to provide guidance in the future, when we have reached better clarity on both internal and external factors. We are also planning to give you an update in the next few weeks regarding the steps we intend to take to adjust our cost structure.

197. Huizinga addressed the need for better alignment between IFP membership revenues and expense level, admitted that the ACA had caused "pronounced deviations from historical averages" in churn and conversion, and revealed that the Company would be taking "additional time to digest all the relevant data points" before finalizing EHTH's forecast:

> My near-term priority as CFO is to achieve a better alignment between individual and family plan membership, and forecasted commission revenues on one hand, and expense levels in the Company the other. We've already identified several areas for potential cost reductions and are working through additional efficiencies. I believe that we can achieve meaningful savings, which will have a positive impact on our future financial results.
>
> In addition, two important drivers of our 2015 financial forecast are the rate at which the individuals on applications submitted during the open enrollment period will convert into paying members, and the attrition within our existing individual member base during the open enrollment period. Given the significant changes in our industry as a result of the Affordable Care Act, we've seen pronounced deviations from historical averages in these previously stable metrics.
>
> This year, we'll be taking additional time to digest all the relevant data points around our open enrollment period performance and membership trends before we finalize our 2015 forecast. Furthermore, we just learned last Friday that the dates for the 2016 open enrollment period were changed by the federal government. The next open enrollment period was expected to take place between October 1 and December 15 of 2015. The end date has now been shifted to January 31 of 2016. This change will impact the expected timing of our individual and family plan application volumes.

198. SunTrust analyst Tobey Summer asked defendants about what variables they needed more clarity on before providing guidance, to which Huizinga replied that defendants would wait until they saw how conversion and churn developed:

> [Sommer:] I just want to start by maybe asking – what's the timeframe or specific elements of the variables you're looking at that you may need more clarity on, in order to provide guidance? Is this waiting for the expense situation to kind of be more solid? Or are there other elements?

> [Huizinga:] Well, I think we also pointed to the fact that there is metrics that we would like to wait to see how those develop here after the open enrollment period ends, to see the churn, to see the submitted application to pay conversions, something that changed significantly a year ago. We want to see those numbers this year.

199. Analysts reacted negatively to defendants' February 25, 2014 disclosures, including to defendants' admission that they lacked sufficient visibility into churn and conversion to provide guidance.

(a) On February 25, 2015, Jefferies issued a report titled "IFP Business Stuck in a Tough Spot: 4 Key Insights from 4Q," which stated:

> EHTH's stock was slashed in half following last month's disappointing preannounce. Today's update showed that IFP problems are even worse than expected. We believe management will initiate plans to trim costs and put IFP in a "maintain" phase. Meanwhile, the company will likely shift gears and focus on driving Medicare growth. We think the stock is stuck in neutral and remain Hold rated.
>
> * * *
>
> **4. Guidance May Not Come Until The Summer; We Expect Revenue To Decline.** Management declined to provide 2015 guidance, which it typically debuts in February. We spoke to the company after the call and we wouldn't be surprised if EHTH didn't issue its outlook until well past 1Q15 results. This will likely leave an overhang on the stock.

(b) On February 25, 2015, Craig-Hallum issued a report titled, "The Only Thing That Is Predictable Is Chaos," which stated:

> Our title is a management quote from the earnings call. To be fair, the quote referred specifically to the upcoming Supreme Court hearing on the state exchanges and subsidy eligibility, only one of many big question marks relative to the company's core IFP business. Another quote we believe represents the IFP situation and helps explain the inability of management to provide guidance for the year: "it's an environment that's changing under our feet."
>
> * * *
>
> **NEGATIVE TAKEWAYS**
>
> Management did not provide guidance for the first quarter or the year, given a number of uncertainties in the market and within the company's go to market strategy.
>
> * * *
>
> **ESTIMATE CHANGES**
>
> We have sharply decreased our FY15 estimates to reflect the shortfall in IFP enrollment. We now anticipate revenue and adjusted EBITDA of $154mm and

($6mm), down from $172mm and $5mm, respectively. Given the lack of clarity on a number of items, we view these estimates as a "best-guess" at this point.

(c) On February 25, 2015, William Blair issued an analyst report titled, "Rough Waters in 2015, and More Uncertainty After," which stated:

We expect the upcoming year to be a difficult one for eHealth and advise investors to stay on the sidelines in the foreseeable future. As expected, based on the pre-earnings announcement, eHealth booked a disappointing quarter, with an adjusted non-GAAP loss in the fourth quarter of $0.44. Declining to provide forward-looking guidance, management spoke of possible restructuring efforts in the IFP segment to descale the business. We believe that any fixes are long-term in nature, and the myriad uncertainties in the near future will bring a certain level of skepticism, or at least potential volatility, around whatever forecast management ultimately issues.

(d) On February 26, 2015, RBC issued a report titled, "Poor application volume + member churn = an upside down expense model," which stated:

**Financial guidance not provided; not a surprise, not a concern.** We say not a concern as management's ability to provide reliable guidance has been absent for over a year and any formal guidance at this juncture would be a shot in the dark. We have adjusted our model to reflect the lower IFP membership numbers and solid Medicare performance to provide our best guess on 2015 and 2016. Our conviction level is low, but a significant step down in revenues and a meaningful loss for 2015 are to be expected in our view.

(e) On February 26, 2015, Deutsche Bank issued a report titled, "4Q14 Wrap: IFP Weather Forecast Calls for Near Zero Visibility," which stated:

**4Q14 revs in line with preview; near zero forward visibility into IFP business**

EHTH's 4Q14 results were in line to the high end of the company's sharply negative preannouncement on January 15. However, it has become clear that the company has extremely limited visibility into the IFP franchise at this point. Mgmt did not feel comfortable providing 2015 guidance due to 1) analysis underway to adjust the cost structure of the IFP business; 2) changes to the 2016 open enrollment period (extended through Jan 31); 3) the new special enrollment period this tax season; and 4) the upcoming SCOTUS decision. While the underlying Medicare franchise continues to grow, questions remain around the viability of EHTH's existing IFP business. Maintain Hold.

200. EHTH's stock price dropped 7%, from $10.13 at the close of trading on February 25, 2015 to $9.41 at close on February 26, 2015, on greater than average volume of 544,660 shares. EHTH's stock price dropped more than 3% the next day, to $9.10 at close on February 27, 2015, on greater than average volume of 571,500.

201. The February 26, 2015 and February 27, 2015 stock price declines were caused by the information communicated in February 25, 2015 News Release, conference call, and Form 8-K, the

internal business conditions that led to the negative conditions reported therein, and the manifestation of risks, the existence and/or magnitude of which had previously been concealed from investors. The February 25, 2015 information therefore caused additional harm to class members who continued to hold shares of EHTH stock until the disclosure.

## IX. ADDITIONAL CONTROL PERSON ALLEGATIONS

202. Defendants Lauer and Huizinga acted as controlling persons of EHTH within the meaning of §20(a) of the Exchange Act as alleged herein, in that:

(a) Each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company;

(b) As a result of their job duties and responsibilities within the Company, each of the Individual Defendants had the power to control or influence the decision making of the Company, including the particular transactions giving rise to the securities violations as alleged herein and exercised the same;

(c) Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected;

(d) Each of the Individual Defendants therefore had the power to influence and control and did influence and control, directly or indirectly, the content and dissemination of EHTH's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, including the various statements which plaintiffs contend are false and misleading as particularized above.

(e) As control persons, Lauer and Huizinga had access to real-time reports regarding consumer applications and conversions from the Company's Back Office customer relationship management system. The Company's SEC Form 10-K for FY13, filed on March 12, 2014, included the following statement regarding EHTH's e-commerce platform:

> *Back Office Systems.* Our proprietary back office customer relationship management systems enable us to provide a full range of customer service tasks in an efficient, highly scalable and personalized manner. Using these tools, we can track each consumer throughout the application process, obtain real-time updates from the carrier, generate automated emails specific to each consumer and access a cross-sell

> engine and dashboard to identify and track cross-sell opportunities. Our auto-email system is feature-rich with HTML capability, customizable merge tags, granular segmentation and tracking capability.

As described by CW2, the public relations manager, Back Office provided information about applicants as well as application and enrollment status. ¶51. She said that anyone with access to Back Office could determine those metrics at any time. *Id*.

203. As set forth above, defendants violated Exchange Act §10(b) and SEC Rule 10b-5 by their acts and omissions as alleged in this complaint. By virtue of their positions as controlling persons, defendants are liable pursuant to §20(a) of the Exchange Act.

204. As a direct and proximate result of defendants' wrongful conduct, plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's publicly traded securities during the Class Period.

## X. CLASS ACTION ALLEGATIONS

205. Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired EHTH securities during the Class Period (the "Class"). Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

206. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. EHTH had more than 17.7 million shares of stock outstanding throughout the Class Period, owned by tens or hundreds of thousands of persons.

207. The market for EHTH securities is efficient. Public information regarding the Company is rapidly incorporated into and reflected by the market price for EHTH securities. Investors who purchased EHTH securities at the prices prevailing in the market during the Class Period therefore presumptively did so in reliance upon each of the false and misleading statements and material omissions alleged herein.

208. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class, which predominate over questions that may affect individual Class members include:

(a) Whether the Exchange Act was violated by defendants;

(b) Whether defendants omitted and/or misrepresented material facts;

(c) Whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) Whether defendants knew or deliberately disregarded that their statements were false and misleading;

(e) Whether and to what extent the price of EHTH securities was affected by the alleged misrepresentations; and

(f) The extent of damage sustained by Class members and the appropriate measure of damages.

209. Lead Plaintiff's claims are typical of those of the Class because Lead Plaintiff and the Class sustained damages from defendants' wrongful conduct.

210. Lead Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Lead Plaintiff has no interests which conflict with those of the Class.

211. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## XI. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### Violation of §10(b) of the Exchange Act & SEC Rule 10b-5 Against All Defendants

212. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

213. By engaging in the acts, practices and omissions previously alleged, each of the defendants violated Exchange Act §10(b) and SEC Rule 10b-5 by:

(a) employing devices, schemes and artifices to defraud;

(b) making untrue statements of material facts or omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaging in acts, practices and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of EHTH common stock during the Class Period.

214. During the Class Period, defendants made, disseminated and/or approved each of the statements specified in §V, *supra*.

215. Each of the statements specified in §V, *supra*, were materially false or misleading at the time they were made, in that they contained misrepresentations of fact or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

216. The statutory safe harbor conditionally provided by 15 U.S.C. §78u-5 for certain forward-looking statements does not apply to any of the statements alleged herein to be materially false or misleading because:

(a) the statements were not forward-looking, or identified as such when made;

(b) the statements were not accompanied by meaningful cautionary language that sufficiently identified the specific, important factors that could cause actual results to differ materially from those in the statement;

(c) the statements were included in a financial statement prepared in accordance with generally accepted accounting principles; or

(d) the statements were made by defendants with actual knowledge that the statement was false or misleading.

217. Defendants made, disseminated or approved the statements specified in §V, *supra*, while knowing or recklessly disregarding that the statements were false or misleading, or omitted to disclose facts necessary to prevent the statements from misleading investors in light of the circumstances under which they were made.

218. Lead Plaintiff purchased shares of EHTH common stock in reliance upon the truth and accuracy of the statements specified in §V, *supra*, and the other information that was publicly reported by defendants about EHTH and its operations, and without knowledge of the facts, transactions, circumstances and conditions fraudulently misrepresented to or concealed from the market during the Class Period, as specified above.

219. Lead Plaintiff and the Class have suffered damages in that they:

(a) paid artificially inflated prices for publicly issued shares of EHTH securities;

(b) purchased their EHTH securities on an open, developed and efficient public market; and

(c) incurred economic losses when the price of those securities declined as the direct and proximate result of the public dissemination of information that was inconsistent with defendants' prior public statements or otherwise alerted the market to the facts, transactions, circumstances and conditions concealed by defendants' misrepresentations and omissions, or the economic consequences thereof.

220. Lead Plaintiff and the Class would not have purchased EHTH common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by the false and misleading statements and omissions specified above.

**SECOND CLAIM FOR RELIEF**

**Violation of §20(a) of the Exchange Act & SEC Rule 10b-5 Against EHTH, Lauer, and Huizinga**

221. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

222. Defendants and/or persons under their control violated Exchange Act §10(b) and SEC Rule 10b-5 by their acts and omissions described above, causing economic injury to Lead Plaintiff and the other members of the Class.

223. By virtue of their positions as controlling persons, defendants are each liable pursuant to Exchange Act §20(a) for the acts and omissions of their co-defendants in violation of the Exchange Act.

224. Each of the defendants acted as a controlling person of some or all of their co-defendants, as summarized in the chart below, because they each had the capacity to control, or did actually exert control, over the actions of their co-defendants in violation of the securities laws:

| Defendant | controlled Defendants | by virtue of |
|---|---|---|
| EHTH | Lauer and Huizinga at all relevant times alleged herein | its power to hire, fire, discipline, and compensate its senior executives and to supervise them in the performance of their job responsibilities. |
| Lauer | EHTH and Huizinga at all relevant times alleged herein | his status as the CEO and a director of the Company, which gave him direct supervisory responsibilities over Huizinga and other EHTH employees who participated in the misconduct alleged herein, his signing of SEC filings, and his power to hire, fire, and compensate Huizinga and other EHTH employees. |
| Huizinga | EHTH and Lauer at all relevant times alleged herein | his status as the CFO of the Company, his supervisory responsibilities over other EHTH employees who participated in the misconduct alleged herein, and his signing of SEC filings. |

225. Each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to, and did, control or influence the business practices or conditions giving rise to the securities violations alleged herein, and the contents of the statements which misled investors about those conditions and practices, as alleged above. By virtue of their high-level positions, ownership of and contractual rights with EHTH, participation in or awareness of the Company's operations, and intimate knowledge of the matters discussed in the public statements filed by the Company with the SEC and disseminated to the investing public, defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the contents and dissemination of the false and misleading statements alleged above.

226. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of EHTH's quarterly reports, press releases, quarterly conference calls and other presentations to securities analysts, money, and portfolio managers and institutional investors. Each of the Individual Defendants was provided with copies of the

Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

## XII. PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for judgment as follows:

A. Declaring this action to be a proper class action and certifying Lead Plaintiff as Class Representative pursuant to Fed. R. Civ. P. 23 and Lead Plaintiff's counsel as Class Counsel;

B. Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing in an amount to be proven at trial, including interest;

C. Awarding Lead Plaintiff and the Class reasonable costs and expenses incurred in this action, including attorneys' fees; and

D. Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## XIII. JURY DEMAND

Plaintiffs demand a trial by jury on all issues.

DATED: June 10, 2015

ROBBINS GELLER RUDMAN
& DOWD LLP
DENNIS J. HERMAN
MATTHEW S. MELAMED

s/ Matthew S. Melamed
MATTHEW S. MELAMED

Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)

Lead Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on June 10, 2015, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the Court's Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Service List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on June 10, 2015.

s/ Matthew S. Melamed

MATTHEW S. MELAMED

ROBBINS GELLER RUDMAN
& DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
E-mail: mmelamed@rgrdlaw.com

EHEALTH
Service List - 6/10/2015 (15-0024)
Page 1 of 1

**Counsel for Defendant(s)**

Jerome F. Birn Jr.
Kelley M. Kinney
Molly A. Arico
Wilson Sonsini Goodrich & Rosati, P.C.
650 Page Mill Road
Palo Alto, CA 94304-1001
650/493-9300
650/493-6811 (Fax)

**Counsel for Plaintiff(s)**

Brian O. O'Mara
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
619/231-1058
619/231-7423 (Fax)

Dennis J. Herman
Robbins Geller Rudman & Dowd LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
415/288-4545
415/288-4534 (Fax)

Laurence M. Rosen
The Rosen Law Firm, P.A.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
213/785-2610
213/226-4684 (Fax)