UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFREY WEST,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>EHEALTH, INC., et al.,<br><br>　　　　Defendants. | Case No. 3:15-cv-00360-JD<br><br>**ORDER GRANTING MOTION TO DISMISS**<br><br>Re: Dkt. No. 31 |

This case is a class action brought by Oklahoma Police Pension & Retirement System ("Oklahoma Police") on behalf of all persons who purchased or otherwise acquired the publicly traded common stock of eHealth, Inc. ("eHealth") between May 1, 2014 and January 14, 2015. Dkt. No. 28 ¶¶ 1, 17. Oklahoma Police alleges in the consolidated complaint that defendants eHealth, its Chairman and CEO, Gary L. Lauer ("Lauer"), and Senior Vice President and CFO, Stuart M. Huizinga ("Huizinga") made false and misleading public statements in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5. *See* Dkt. No. 28 ¶¶ 1-2, 14. Defendants move to dismiss the complaint for failure to state a claim under the pleading standards of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4. Dkt. No. 31 at 4-20. Because the complaint fails to properly plead falsity and scienter, the Court dismisses it with leave to amend.

## BACKRGOUND

As alleged in the complaint, eHealth is the first and largest private health insurance exchange in the country. Dkt. No. 28 ¶ 22. Through eHealth's online exchange, individuals, families, and small businesses can apply for, purchase, and enroll in health insurance plans issued by leading health insurance carriers, such as Aetna, UnitedHealthcare, and Kaiser Permanente.

Dkt. No. 28 ¶¶ 22-24.  When a customer purchases a health insurance plan through eHealth's platform, the issuing carrier pays eHealth a commission, which is either a percentage of the premium paid by the customer, or a flat monthly payment.  Dkt. No. 28 ¶¶ 25-26.  At all times relevant to the allegations in the complaint, these commission payments constituted eHealth's primary source of revenue.  Dkt. No. 28 ¶ 25.

In late 2013 and early 2014, analysts and investors began taking a bullish outlook on eHealth.  Dkt. No. 28 ¶¶ 41-44.  They believed that eHealth was well-positioned to take advantage of various requirements implemented by the Patient Protection and Affordable Care Act ("ACA").  Dkt. No. 28 ¶ 41.  In particular, the ACA implemented (1) an individual mandate, which requires each individual covered by the ACA to enroll in a heath plan; (2) an annual open enrollment period, which establishes a set timeframe when individuals must purchase health insurance; and (3) a guaranteed issue provision, which prohibits carriers from denying health insurance to individuals based on factors that may affect their health.  Dkt. No. 28 ¶ 40.

Ultimately, however, eHealth did not benefit from the ACA to the extent anticipated.  On July 30, 2014, the company reported disappointing 2Q 2014 results and downgraded its guidance for the remainder of 2014, citing unexpected difficulties in converting applicants into premium-paying members.  Dkt. No. 28 ¶ 8.  Following this report, eHealth's common stock dropped 35%.  Dkt. No. 28 ¶ 176.  On January 14, 2015, the stock plunged again after the company reported its preliminary financial results for 2014 which were below the company's previously reduced guidance.  Dkt. No. 28 ¶¶ 133-34.  On February 25, 2014, the company announced its finalized financial results for 2014 and declined to issue guidance for 2015, stating that its experience in 2014 showed that the ACA had produced "pronounced deviations from historical averages" that undermined the company's confidence in its ability to predict earnings for 2015.  Dkt. No. 28 ¶¶ 146-47.

Plaintiffs allege that in the wake of the ACA's implementation, eHealth and its senior executives inflated the stock prices by issuing materially false or misleading statements suggesting that the company maintained visibility into key metrics for membership growth and revenue generation.  Dkt. No. 32 at 1.  Defendants raise the usual objection in securities cases that

plaintiffs' allegations do not satisfy the heightened pleading standards required in a securities fraud action. Specifically, defendants contend that plaintiffs fail to plead (1) an actionable statement that was false or misleading when made; and (2) any specific facts creating a strong inference of scienter. Dkt. No. 31 at 4-15.

**DISCUSSION**

**I.     Legal Standard**

On a 12(b)(6) motion, the Court must accept all factual allegations in the complaint as true. *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). But to survive the motion, plaintiffs must allege "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). In this case, which arises under Section 10(b) of the Exchange Act, the complaint is also subject to the heightened pleading requirements of Fed. R. Civ. Proc. 9(b) and the PSLRA which require "plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter." *In re ChinaCast Educ. Corp.*, 809 F.3d 471, 474 (9th Cir. 2015) (citing *Tellabs*, 551 U.S. at 313).

**II.    Section 10(b) Claim**

Section 10(b) of the Exchange Act makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance." 15 U.S.C. § 78j(b). Put more clearly, it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10(b)–5(b). To state a securities fraud claim under this section, plaintiffs must plead: "(1) a material representation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the

3

misrepresentation or omission; (5) economic loss; and (6) loss causation." *Thompson v. Paul*, 547 F.3d 1055, 1061 (9th Cir. 2008) (quoting *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)). Since defendants do not contest elements (3) through (6), the Court focuses on whether plaintiffs have adequately pled the first two elements: falsity and scienter.

**A. Falsity**

A statement or omission is actionably false if it creates an "impression of a state of affairs that differ[s] in a material way from the one that actually exist[s]." *Reese v. Malone*, 747 F.3d 557, 570 (9th Cir. 2014) (citation omitted). To plead falsity under the PSLRA, plaintiffs must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B).

Plaintiffs' complaint rests on defendants' alleged misrepresentations about three metrics for the company's revenue generation: (1) churn -- the rate of membership attrition; (2) conversion -- the percentage of applicants who become premium-paying members[1]; and (3) membership and financial guidance. As currently alleged, none of the challenged statements are actionably false.

**1. Churn**

Plaintiffs allege that eHealth and its officers made false or misleading statements about eHealth's level of "churn" on at least three occasions: a May 1, 2014 Q1 earnings call; a July 30, 2014 Q2 earnings call; and an October 30, 2014 Q3 earnings call. Dkt. No. 37, Ex. A at 1-2. Specifically, plaintiffs allege that these statements were false or misleading:

- On the May 1, 2014 earnings call, Lauer stated that "[b]ased on the most recent data, including commission payments that we've received from our carrier partners so far, our current estimate of churn for the first quarter of 2014 falls well within the range that we assumed in our 2014 annual guidance." Dkt. No. 28 ¶ 74.

- On the July 30, 2014 earnings call, Huizinga informed investors that "[o]ur view of churn is that it's a little bit lower than what we saw in Q1. . . . But looking at our collections of cash and looking at revenue, things look to be in line right now." Dkt. No. 28 ¶ 103.

---

[1] Defendants disagree with this definition of conversion. The Court addresses the disagreement in Subsection II.A.2(i).

- On the same call, Huizinga indicated that all the metrics, including churn, were not "out of the ordinary" and "in line with [the company's] norms." Dkt. No. 28 ¶ 104.

- On the October 30, 2014 earnings call, Huizinga noted that the churn rate in the third quarter was "similar to what we observed in the second quarter of this year." Dkt. No. 28 ¶ 123.

To establish falsity, plaintiffs rely on two statements Huizinga made on the February 25, 2015 earnings call:

- "Given the significant changes in our industry as a result of the Affordable Care Act, we've seen pronounced deviations from historical averages in these previously stable metrics [of churn and conversion]." Dkt. No. 28 ¶ 146

- "[T]here is [sic] metrics that we would like to wait to see how those develop here after the open enrollment period ends, to see the churn, to see the submitted application to pay conversions, something that changed significantly a year ago." Dkt. No. 28 ¶ 148.

In plaintiffs' view, these statements indicate that defendants knew their earlier statements that "the ACA had caused minimal deviations from historical churn" were not true. Dkt. No. 32 at 8.

Defendants say that the statements made on February 25, 2015 should be understood as "comparing pre-ACA metrics with the tumultuous 2014 experience." Dkt. No. 34 at 6. But this explanation only highlights why defendants' earlier statements about churn may have been misleading. Far from suggesting a "tumultuous experience," the statements made on the May 1, 2014, July 30, 2014, and October 30, 2014 earnings calls suggested that churn was stable despite uncertainties attributable to the ACA. Dkt. No. 28 ¶¶ 74, 103-4, 123.

Defendants' explanation, then, is not convincing. But the February 25, 2015 statements, without more, do not meet the exacting pleading standard under the PSLRA. A later statement may establish defendants' "contemporaneous knowledge of the falsity" of their earlier statement, if "the later statement directly contradicts or is inconsistent with the earlier statement." *In re Read-Rite Corp.*, 335 F.3d 843, 846 (9th Cir. 2003), *abrogated on other grounds as recognized in South Ferry, L.P., No. 2 v. Killinger,* 542 F.3d 776, 782–84 (9th Cir. 2008). Plaintiffs' problem is that Huizinga's statements on February 25, 2015 do not directly contradict defendants' earlier statements about churn. The pattern of deviation that Huizinga identified on February 25, 2015

5

may not have emerged until the churn rate was tracked over a longer period of time, and a general description of such a pattern does not prove that defendants' earlier statements about churn were false when made. *See id.* at 848 ("It is clearly insufficient for plaintiffs to say that a later, sobering revelation makes an earlier, cheerier statement a falsehood.") (citation omitted); *id* at 847-48 (holding that the later statement about the need to develop the "undershoot reduction" feature was not necessarily inconsistent with the earlier statements about the status of the development of products more generally).

The allegations from confidential witnesses, CW2 and CW3, lend little help to show that defendants' statements about churn were false when made. CW2, who worked as a public relations manager at eHealth between 2007 and January 2014, allegedly observed that "membership had fallen dramatically" in cities such as Atlanta, Los Angeles, Dallas, Miami, and Chicago. Dkt. No. 28 ¶ 45. That may be perfectly true but nothing in the complaint alleges that CW2's one-off observation about these cities was representative of a larger material trend. The complaint also alleges that some of CW2's superiors met with Lauer "at least once a month," *id.* at ¶ 46, but does not provide "adequate corroborating details" about the time, place, subject matter, or context of these meetings. *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005). Similarly, CW3 alleges that she personally participated in meetings where reports with information about churn were circulated, Dkt. No. 28 ¶¶ 37-38, 77, but does not detail any discussions about churn at these meetings that would render Huizinga and Lauger's statements false when made.

Plaintiffs' claim that defendants misled investors into thinking that churn was stable is further undermined by the cautionary disclosures stated during the very earnings calls when allegedly misleading statements were made. For example, on the May 1, 2014 earnings call, immediately before Huizinga made the allegedly false statement that "[b]ased on the most recent data . . . our current estimate of churn for the first quarter of 2014 falls well within the range that we assumed in our 2014 annual guidance," he warned that the ACA would likely lead to "an increase . . . in estimated individual and family plan churn . . . relative to [the company's]

6

historical rates." Dkt. No. 31-3, Ex. B at 5.[2] On a subsequent earnings call on July 30, 2014, Huizinga stated that while churn "is a little bit lower than what we saw in Q1," it is still "*elevated from historical levels*." Dkt. No. 31-3, Ex. C at 8 (emphasis added).

Plaintiffs contend that these warnings exacerbated the misleading impact of the statements because they "reassured investors that EHTH had assessed the conditions presenting risks to the Company's ability to estimate churn and, even in light of those risks, it had reliable internal information." Dkt. No. 37, Ex. A at 2. But defendants' public filings and earnings calls are replete with warnings about the company's inability to accurately estimate churn. *See, e.g.*, May 1, 2014 Earnings Call Transcript, Dkt. No. 31-3, Ex. B at 5 ("[W]e are not going to have a full view of churn that occurred during the open enrollment period which ended on March 31st until later in the year"); July 30, 2014 Form 8-K, Ex. I at 158 ("[I]t is difficult for us to determine with any certainty the impact of current conditions such as health care reform implementation on our membership retention"); October 30, 2014 Form 8-K, Ex. K at 208 (same). In light of defendants' warnings about their lack of visibility into churn, the two sentences Huizinga made on February 25, 2015 that churn "substantially changed" after the ACA's implementation are not enough to meet the PSLRA's exacting standard for pleading falsity.

### 2. Conversion

#### (i) May 1, 2014 and June 5, 2014 Conversion Statements

As an initial matter, the parties disagree about the meaning of "conversion" and "close ratio" as used by Huizinga and Lauer during the May 1, 2014 and June 5, 2014 earnings calls. Plaintiffs say that these terms refer to the percentage of applicants who become premium-paying members. Dkt. No. 32 at 4-5. Defendants say that they refer to the percentage of submitted applications that are approved by insurance carriers. Dkt. No. 31 at 5-7. This definitional dispute occurs in the context of these statements:

- On the May 1, 2014 earnings call, Huizinga confirmed that "a higher conversion rate of something upwards of 80%" is "what [the company]

---

[2] Plaintiffs do not object to the Court taking judicial notice of Exhibits B-D, H-I, and K. Dkt. No. 33 at 1.

saw in January." Dkt. No. 28 ¶ 69.

- Later on the same earnings call, Huizinga commented that "this close rate is definitely making each submitted application more valuable to us than it's been in the past," and elaborated that "the company experienced "roughly a 30% to 35% increase in the value of a submit just based on [the] close ratio change," "from mid-50s to 60% . . . to 80%." Dkt. No. 28 ¶ 70.

- On the same earnings call, Lauer reiterated that "in January, [the company is] seeing close to 80% [close ratio]," and as a result the company is "getting a much more attractive conversion rate there and an improved cost of acquisition." Dkt. No. 28 ¶ 70.

- On the June 5, 2014 earnings call, Lauer said "our conversions continue to increase." Dkt. No. 28 ¶ 88.

When read in context, Huizinga and Lauer's statements on May 1, 2014 and June 5, 2014, were referring to the submitted to approved rate, not the submitted to payment rate. Consequently, plaintiffs' claim that Huizinga's later statement on July 30, 2014 that eHealth's conversion rate for Q1 2014 was "low 70s" is not proof that Huizinga and Lauer's earlier statements on May 1, 2014 and June 5, 2014 that the conversion rate was "close to 80%" and continues to increase were false when made. *See* Dkt. No. 28 ¶¶ 96-97.

The definitional context is particularly clear for the May 1, 2014 earnings call, when Huizinga explicitly stated that "approval rates for applications submitted in January were close to 80% compared to the high 50s to low 60s percentage rates historically." Dkt. No. 31-3, Ex. B at 5. When Huizinga and Lauer cited these same figures later on the call, a reasonable investor would have understood that they were referring to the submitted to approved rate. In addition, on both earnings calls, Huizinga and Lauer referred to the conversion rate and close ratio in the context of discussing the impact of the ACA's guaranteed issue provision on eHealth. Since the guaranteed issue provision prohibited insurance carriers from rejecting applications for health reasons, a reasonable investor would have understood Huizinga and Lauer's statements as referring to the percentage of submitted applicants who are approved by insurance carriers, not the percentage of submitted applicants who become premium-paying members.

Plaintiffs argue that such a reading "impermissibly contradicts the Complaint and reasonable inferences drawn from the facts pled therein." Dkt. No. 32 at 4-5. The Court

8

disagrees. Although the Court accepts plaintiffs' allegations as true, they still must "plausibly" support, and cannot be "merely consistent with," plaintiffs' claim for relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). The Court will not accept interpretations of the statements that are taken out of context and are not plausible on its face. While the use of the word "conversion" to mean different things at different times may have caused some confusion, the statements, read in context, were sufficiently clear and did not "affirmatively create an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *Police Ret. Sys. v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1061 (9th Cir. 2014) (citation omitted).

Plaintiffs also allege that defendants lacked visibility into the data to support their May 1, 2014 and June 5, 2014 conversion statements. Dkt. No. 32 at 5. Specifically, plaintiffs cite Huizinga's statement on July 30, 2013 that eHealth "still need[s] more information from carriers to fully understand" conversion rate. *Id.* (citing Dkt. No. 28 ¶ 97). However, from the context, it is clear that Huizinga was discussing the need to more fully understand the reasons that the company had been struggling to collect commissions, not eHealth's lack of ability to estimate the conversion rate altogether. Plaintiffs seek to rely on the fact that on February 25, 2015, defendants declined to provide guidance for 2015 because it wanted "to see how [various metrics] develop here after the open enrollment period ends." *Id.* (citing Dkt. No. 28 ¶ 148). This shows only that defendants wanted to collect more data points before issuing guidance in light of various uncertainties, and does not suggest that defendants lacked any reasonable basis for their earlier conversion estimates.

Plaintiffs go on to say that the earnings calls were misleading because they reported only the January conversion numbers without revealing the numbers for February and March. Dkt. No. 37, Ex. A at 3. If defendants lacked visibility into conversion, as plaintiffs allege, it is implausible that defendants could have avoided misleading their investors by disclosing more information about a metric that defendants could not accurately measure. Even assuming plaintiffs are arguing in the alternative, Huizinga's statement on the May 1, 2014 earnings call was far from misleading. Huizinga explicitly explained that the 80% conversion rate was for "January, the first kind of full month of conversion that we have in house." Dkt. No. 28 ¶ 69. In the absence of allegations that

9

the submitted to approved rate for January that defendants reported was factually inaccurate, defendants' omission of February and March numbers is not actionable. *Intuitive Surgical, Inc.*, 759 F.3d at 1061 ("We have expressly declined to require a rule of completeness for securities disclosures.").

The closest plaintiffs get to alleging factual inaccuracy is when they say that, contrary to Lauer's statement that the cost of acquisition improved, eHealth's cost of acquisition had actually increased in the first quarter of 2014. Dkt. No. 28 ¶ 73. In order to make this allegation, plaintiffs calculate the cost of acquisition using their own formula. *Id.* But plaintiffs do not allege any facts that suggest that by "cost of acquisition," defendants were referring to the same formula that plaintiffs used. *See* Dkt. No. 31 at 7 (defendants arguing that plaintiffs erroneously calculated cost of acquisition across all member categories rather than IFP members that Lauer was referring to). While Lauer could have more clearly defined what he meant by "cost of acquisition," his failure to do so does not make his statement actionably false. Plaintiffs must allege, with the requisite particularity, facts that show Lauer's remark about "improved cost of acquisition" was objectively false when made, not simply that it could be false under plaintiffs' adopted definition.

### (ii) July 30, 2014 and October 30, 2014 Conversion Statements

The alleged misstatements made on the July 30, 2014 and October 30, 2014 earnings calls are equally unavailing. In these statements, defendants do not dispute that Huizinga and Lauer were referring to the submitted to payment conversion rate, and therefore in this section "conversion" means the submitted to payment conversion rate, unless specified otherwise.

Plaintiffs again rely on the February 25, 2015 statements that the ACA had caused "pronounced deviations" from eHealth's historical averages in conversion to demonstrate the falsity of defendants' conversion statements during the July 30, 2014 and October 30, 2014 earnings calls. Dkt. No. 37, Ex. A at 4-5. For the same reasons that these statements were insufficient to establish that defendants' churn statements were false when made, they are insufficient to plead falsity of defendants' conversion statements. *See supra* Subsection II.A.1. In fact, this argument is even weaker as applied to defendants' conversion statements. Unlike with

churn, defendants openly admitted that the conversion rate had dropped from the "high 80s-percent" a year ago to "low 70s" in Q1 2014. Dkt. No. 28 ¶ 97.

Plaintiffs also allege that defendants' statements during these earnings calls falsely implied that the decline in the conversion rate was primarily driven by problems with the insurance carriers. Dkt. No. 28 ¶¶ 97, 119-20. Specifically, plaintiffs deem these statements to be misleading:

- On the July 30, 2014 earnings call, to the question from an analyst whether the low conversion rate was caused by the lack of data from carriers, Huizinga answered that "[i]n some cases, that's clearly what's going on. We've had carriers specifically tell us that they've had system issues, they'd acknowledged that." Dkt. No. 28 ¶ 97.

- On the October 30, 2014 earnings call, Lauer stated that "our analysis indicates that these issues lie with a subset of carriers and were driven predominantly by carrier-specific issues rather than a broad change in consumer behavior as a result of the Affordable Care Act." *Id.* at ¶ 119.

- On the same call, Lauer went on to say that "carriers have been . . . working to resolve these issues" and that "we expect that payment rates on members who apply through our platform during this upcoming open enrollment period and get approved should increase relative to the last open enrollment period." *Id.*

- On the same call, Huizinga also stated that "we identified some of the root causes behind the lower payment rates we experienced from our Q1 applicants. . . . the conversion issues were isolated to certain carriers and we've been working with these carriers to improve the processes that cause the issues in time for the upcoming open enrollment period. This should have a favorable impact on the rates at which our approved individual and family plan members [convert] into revenue-generating members." *Id.* at ¶ 120.

A better characterization of these statements is that they amount to "inherently subjective puffing" and do not provide the basis for a securities violation. *Oregon Pub. Empl. Ret. Fund v. Apollo Group Inc.*, 774 F.3d 598, 606 (9th Cir. 2014). Defendants prefaced their assessment by saying "our analysis indicates," and "we identified." Dkt. No. 28 ¶ 119. Even though defendants at times expressed their beliefs in more definite terms, they were always expressing their subjective opinion about what they believed had caused the decline in the conversion rate and none of the statements were "capable of objective verification" that can "constitute material

11

misrepresentations." *Apollo Group Inc.*, 774 F.3d at 606.  Just as our circuit found in *Apollo* that defendants' use of general terms such as "educational content" and "teaching resources" prefaced by "we believe" were mere puffery, the Court finds that defendants' use of general terms such as "system issue" and "processes," and vague statements of optimism such as "favorable impact" are not sufficient to allege falsity.  *Id.*

Plaintiffs invoke *OmniCare, Inc. v. Laborers District Council*, 135 S. Ct. 1318 (2015), to argue that based on these statements "investors reasonably understood defendants to have visibility sufficient to diagnose carrier fault as the primary cause for EHTH's poor results."  Dkt. No. 32 at 6.  Defendants object to plaintiffs' reliance on *OmniCare* on the ground that the case involved a Section 11, not a Section 10(b) claim.  Dkt. No. 34 at 4.  The Supreme Court noted that its analysis of Section 11's omission provision was "not unique to § 11." *Id.* at 1330.  And at least one case in this district has applied the *OmniCare* analysis to a Section 10(b) claim.  *See In re Velti PLC*, No. 13-cv-3889-WHO, 2015 WL 5736589, at *33, 38 (N.D. Cal. 2015).

The Court need not decide this issue because even if applied, *OmniCare* does not change the outcome for plaintiffs.  *OmniCare* held that a statement of opinion could be actionably false in two ways: (1) if the speaker did not in fact hold the stated belief; or (2) if the speaker omitted facts going to the basis for one's opinion that would make the opinion statement misleading to a reasonable person.  *OmniCare, Inc.*, 135 S. Ct. at 1326, 1332.

Here, plaintiffs have not alleged enough facts to demonstrate that defendants did not in fact hold their stated beliefs.  Plaintiffs cite CW1, a former regional account coordinator who testifies that eHealth's conversion rate was "negatively affected by a shift in customer behavior that started at the beginning of the first open enrollment period," and this was "known within EHTH."  Dkt. No. 28 ¶¶ 52-56.  Similarly, plaintiffs also cite CW3 who allege that the "issue of customers submitting multiple applications for a single IFP policy through different brokers" was regularly discussed at executive meetings.  *Id.* at ¶¶ 56, 72.  But plaintiffs do not allege that either CW1 or CW3 interacted with Huizinga or Lauer, or allege with any particularity what type of data CW1 and CW3's observed trend was based on or whether their observed trend was generalizable across the company.

12

Plaintiffs also fail to adequately allege that defendants' statements were made misleading by their failure to mention facts about how they formed their opinion. *OmniCare* recognized that "[a]n opinion statement . . . is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way," because opinion statements almost by definition "rest on a weighing of competing facts." *OmniCare*, 135 S. Ct. at 1329. CW1 and CW3's allegations, read in the most favorable light, do no more than establish that eHealth was aware that one cause of the low conversion rate was the change in consumer behavior; it does not rule out the possibility that eHealth was also suffering from carrier-related problems. Defendants were entitled to form an opinion that carrier-related issues were the primary driver of the low conversion. Especially when defendants explicitly disclosed that eHealth "needed more information," to determine to what extent the low conversion rate was caused by problems in carriers' systems or consumers' failure to pay, defendants' subjective assessment about the cause of the low conversion rate was not misleading. Dkt. No. 28 ¶ 97.

### (iii) Membership and Guidance

Plaintiffs argue that defendants' membership estimates and financial guidance made or confirmed on May 1, 2014, July 30, 2014, and October 30, 2014 were misleading because they were calculated based on the churn and conversion rates into which defendants lacked visibility. Dkt. No. 37, Ex. A at 8-9. Since plaintiffs have failed to adequately allege that defendants lacked visibility into churn and conversion, the Court may dismiss these statements without further discussion.

Even assuming that defendants lacked the ability to accurately estimate the underlying churn and conversion rates, plaintiffs cannot overcome the PSLRA's safe harbor. PSLRA provides a "safe harbor for forward-looking statements identified as such, which are accompanied by meaningful cautionary statements." *In re Cutera*, 610 F.3d 1103, 1112 (9th Cir. 2010). A "forward-looking statement" is defined as "any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions underlying or related to any of these issues." *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America W. Holding Corp.*, 320 F.3d 920, 936 (9th Cir. 2003)

13

(citing 15 U.S.C. § 78u-5(i)).

The record demonstrates that at the beginning of each earnings call and guidance statement during the class period, eHealth identified membership estimates and revenue projections as forward-looking statements. *See* Dkt. No. 31-3, Ex. B-C, H (Earnings Calls); Ex. D, I, K (Forms 8-K). These statements were also accompanied by the required cautionary language identifying important risk factors. For example, in Form 8-K dated May 1, 2014, defendants identified as potential risks eHealth's "ability to retain existing members . . . to convert online visitors into members," as well as its "ability to accurately estimate membership." Dkt. No. 31-3, Ex. D at 53. The other earnings calls and guidance statements also contained or directed investors to similar warnings, and therefore membership estimates and financial guidance are entitled to the PSLRA's safe harbor and are not actionable.

### B. Scienter

Because plaintiffs fail to plead falsity, the Court need not reach the issue of scienter. *In re Mellanox Tech., Ltd.*, No. 13-cv-4909-JD, 2014 WL 7204864, at *5 (N.D. Cal. 2014). But, for the sake of completeness, in the event plaintiffs choose to amend the complaint, the Court analyzes whether plaintiffs have adequately pled scienter.

Under the PSLRA, "with respect to each act or omission," a plaintiff must "state with particularity facts giving rise to strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The required state of mind is a "mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc.*, 551 U.S. at 319 (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, n.12). In order to constitute a "strong inference" of the required state of mind, the inference from the alleged facts "must be more than merely 'reasonable' or 'permissible,'" but "cogent" and "at least as compelling as any opposing inference one could draw." *Id.* at 324. The relevant inquiry is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 323.

Considering the complaint in its entirety, plaintiffs have not alleged any direct evidence of scienter such as an incriminating statement from either of the individual defendants. Contrary to

14

1   plaintiffs' assertion, Huizinga's statements on February 25, 2015 do not constitute such evidence.

2   *See supra* Subsection II.A.

3         Plaintiffs' reliance on a "core operations" theory is misplaced.  Plaintiffs assert no more than "corporate management's general awareness of day-to-day workings of the business," which "does not establish scienter -- at least absent some additional allegation of specific information conveyed to management and related to the fraud."  *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784-85 (9th Cir. 2008) (citation and internal quotation marks omitted).  Alternatively, plaintiffs may plead scienter by alleging specific circumstances that demonstrate that the allegedly known but undisclosed facts were "prominent enough" that it would be "absurd to suggest" that they were not known to the defendants.  *Berson v. Applied Signal Tech, Inc.*, 527 F.3d 982, 989 (9th Cir. 2008).  Plaintiffs have alleged no such fact.

      A holistic analysis under *Tellabs* also does not salvage plaintiffs' scienter pleading.  As explained above, the alleged statements from the anonymous witnesses are not compelling because they fail to explain how they "would possess the [company-wide] information" and to provide "adequate corroborating details."  *In re Daou Sys., Inc.*, 411 F.3d at 1015.  Plaintiffs' allegations of motive are equally unhelpful.  While allegations of "personal financial gain may weigh in favor of a scienter inference," *Tellabs, Inc.*, 551 U.S. at 310, a general market pressure to meet financial guidelines that plaintiffs assert is not evidence of scienter, *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1038 (9th Cir. 2002) ("If scienter could be pleaded merely by alleging that officers and director possess motive and opportunity to enhance a company's business prospects, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions.") (citation and internal quotation marks omitted).  Because nothing in the facts pled by plaintiffs renders the inference of knowing deception "at least as compelling as" the competing, innocent explanation for the same facts, the complaint fails to adequately plead scienter under the PSLRA.  *Tellabs*, 551 U.S. at 314.

**III.  Section 20(a)**

      "To establish controlling person liability [under Section 20(a)], the plaintiff must show that a primary violation was committed and that the defendant directly or indirectly controlled the

violator." *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996) (citation and internal quotation marks omitted). Since plaintiffs have not adequately pled a violation of Section 10(b), plaintiffs' claim under Section 20(a) must also be dismissed.

## CONCLUSION

The consolidated complaint is dismissed with leave to amend consistent with this order. Within thirty days from the date of this order, plaintiffs may file either an amended complaint, or a notice of submission to the Court's order dismissing the consolidated complaint, resulting in a final judgment for defendants. Failure to file either an amended complaint or notice of submission may result in dismissal for failure to comply with this order.

**IT IS SO ORDERED.**

Dated: March 14, 2016

JAMES DONATO
United States District Judge